**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| MOJO MOBILITY INC,<br><br>*Plaintiff,*<br><br>v.<br><br>SAMSUNG ELECTRONICS CO. LTD. *et al.*,<br><br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 2:22-CV-00398-JRG-RSP |

**CLAIM CONSTRUCTION ORDER**

On February 6, 2024, the Court held a hearing to determine the proper construction of the disputed claim terms in U.S. Patent Nos. 11,316,371 (the "'371 Patent"); 11,462,942 (the "'942 Patent"); 11,201,500 (the "'500 Patent"); 11,292,349 (the "'349 Patent"), 9,577,440 (the "'440 Patent); and 7,948,208 (the "'208 Patent") (collectively "Asserted Patents"). Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing (Dkt. Nos. 57, 61, 65)[1], having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

TABLE OF CONTENTS


I. BACKGROUND ..... 3

II. APPLICABLE LAW ..... 14

III. LEVEL OF ORDINARY SKILL IN THE ART ..... 20

IV. CONSTRUCTION OF AGREED TERMS ..... 21

V. CONSTRUCTION OF DISPUTED TERMS ..... 22

A. "near a first resonant frequency"; "near a resonant frequency"; "near the resonance frequency" ..... 22

B. "power parameter" ..... 26

C. "a voltage regulator coupled to an output of the receiver rectifier circuit and coupled to the microcontroller" ..... 30

D. "a means for avoiding overcharging one or both of the mobile device and battery inductively" ..... 33

E. "placed upon or close to" ..... 37

F. "universal base unit" ..... 39

VI. CONCLUSION ..... 42

## I. BACKGROUND

Plaintiff Mojo Mobility ("Plaintiff" or "Mojo") alleges that Defendants Samsung Electronics Co. LTD., and Samsung Electronics America, Inc. ("Defendants" or "Samsung") infringe the Asserted Patents. Shortly before the start of the February 6, 2024 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion.

The '208 Patent, titled "Power Source, Charging System, and Inductive Receiver for Mobile Devices," was filed on June 1, 2007, and issued on May 24, 2011. The '440 Patent, titled "Inductive Power Source and Charging System," was filed on May 25, 2011, and issued on February 21, 2017. The '208 Patent and the '440 Patent share a similar specification. The '208 Patent and '440 Patent relate "to power supplies and other power sources, and particularly to a portable inductive power source." '440 Patent at 1:36–38.

The Abstract of the '440 Patent states:

> A portable inductive power source, power device, or unit, for use in powering or charging electrical, electronic, battery-operated, mobile, and other devices is disclosed herein. In accordance with an embodiment the system comprises a pad or similar base unit that contains a primary, which creates an alternating magnetic field by means of applying an alternating current to a winding, coil, or any type of current carrying wire. A receiver comprises a means for receiving the energy from the alternating magnetic field from the pad and transferring it to a mobile or other device. In some embodiments the receiver can also comprise electronic components or logic to set the voltage and current to the appropriate levels required by the mobile device, or to communicate information or data to and from the pad. Embodiments may also incorporate efficiency measures that improve the efficiency of power transfer between the charger and receiver.

Claim 1 of the '440 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

> 1. A mobile device capable of inductive powering or charging by a *universal base unit* for charging of different mobile devices and/or batteries of different charging characteristics associated therewith, comprising:
>
> a battery, wherein one or both of a mobile device and the battery have particular charging characteristics associated therewith;
>
> a receiver and receiver coil, for one of inductively powering the device or charging the battery in the mobile device, wherein the receiver is one of attached to or incorporated into the battery or the mobile device, and wherein the receiver coil has a generally planar shape so that a magnetic field received in a direction substantially perpendicular to the plane of the receiver coil is used to inductively generate a current in the receiver coil;
>
> an identification component associated with the mobile device or battery, which is configured to provide wireless identification of the receiver to the *universal base unit*;
>
> *a means for avoiding overcharging one or both of the mobile device and battery inductively*; and
>
> a regulator, coupled to the output of the receiver or to the battery, that regulates an output voltage or output current provided by the receiver, to the mobile device or battery, to be within a range of parameters for the mobile device or the battery;
>
> wherein different mobile devices and batteries can have different charging characteristics associated therewith; and
>
> wherein the receiver communicates with the base unit to detect, identify and authenticate the receiver with the base unit, as provided by the identification component,
>
> determine and then activate one or more primary coils of the base unit which are aligned with the receiver coil,
>
> verify the continued presence of the receiver near the base unit, and
>
> communicate information describing the characteristics of the mobile device or the battery, for use by the base unit to provide power transfer to the receiver and to the mobile device and the battery according to their particular charging characteristics.

The Abstract of the ’208 Patent states:

> A power source, charging system, and inductive receiver for mobile devices. A pad or similar base unit comprises a primary, which creates a magnetic field by applying an alternating current to a winding, coil, or any type of current carrying wire. A receiver comprises a means for receiving the energy from the alternating magnetic field and transferring it to a mobile or other device. The receiver can also comprise electronic components or logic to set the voltage and current to the appropriate levels required by the mobile

> device, or to communicate information or data to and from the pad. The system may also incorporate efficiency measures that improve the efficiency of power transfer between the charger and receiver.

Claim 1 of the ’208 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

> 1.A charger system for use with a mobile, electronic, or other device and/or battery, battery door, or skin for use with the device, for charging and/or powering the device and/or battery inductively, comprising:
>
> a base unit having a surface, and comprising a plurality of primary coils arranged behind and parallel to the surface,
>
> wherein each of the primary coils is positioned within the base unit, and
>
> wherein each of the primary coils is associated with a switching circuit in the base unit, which switching circuit is capable of being selectively switched to activate its associated primary coil so that, when an electrical current is passed through that activated primary coil, a magnetic field is generated by that activated primary coil in a direction substantially perpendicular to the surface of the base unit, and
>
> wherein the base unit and/or switching circuit includes a capacitive or other component that decreases harmonics in that activated primary coil;
>
> a power supply for passing a current through the primary coils when activated, to generate the magnetic field in a direction substantially perpendicular to the plane of the primary coils;
>
> a communications interface that the base unit, and the mobile, electronic, or other device and/or battery, battery door, or skin for use with the device, use to communicate with one another during powering or charging, to poll each of the primary coils, or receive a signal from a sensor associated therewith, to verify the presence of the mobile, electronic, or other device and/or battery, battery door, or skin for use with the device *placed upon or close to* the surface of the base unit, select, based on the polling or sensing, from within the plurality of primary coils, and selectively switch, using their associated switching circuits to activate, only those one or more primary coils which are determined to be most closely aligned with a receiver coil at the mobile, electronic, or other device and/or battery, battery door, or skin for use with the device, and
>
> periodically thereafter exchange information to provide power transfer to the device and/or battery, including device and/or battery charging or power status or presence; and

> wherein the substantially perpendicular magnetic field is used to inductively generate a current in the receiver coil within or on the mobile, electronic, or other device and/or battery, battery door, or skin for use with the device placed upon the activated primary coil of the base unit, to charge or power the device and/or battery, and
>
> wherein the base unit, and receiver coil or circuitry associated therewith, use current modulation performed by the receiver coil or its circuitry, to provide an indication that is then used by the base unit to determine and regulate one or more of output voltage, current, or power provided by the base unit to the device and/or battery to be within the range of one or more of a value of a required voltage, current, or other *power parameter* for the mobile, electronic, or other device and/or battery, battery door, or skin for use with the device, and/or verify the continued presence of the receiver coil near the base unit.

The '500 Patent, titled "Efficiencies and Flexibilities in Inductive (Wireless) Charging," was filed on August 5, 2018, and issued on December 14, 2021. The '371 Patent, titled "System and Method for Inductive Charging of Portable Devices," was filed on October 21, 2021, and issued on April 26, 2022. The '942 Patent, titled "Efficiencies and Method Flexibilities in Inductive (Wireless) Charging," was filed on April 25, 2022, and issued on October 4, 2022. The '500 Patent, the '371 Patent, and the '942 Patent share a similar specification. The '500 Patent, the '371 Patent, and the '942 Patent relate "to power supplies, power sources, and particularly to a system and method for inductive charging of portable devices." '942 Patent at 1:45–47; '500 Patent at 2:16–18; '371 Patent at 1:54–56.

The Abstract of the '500 Patent states:

> A charger or power supply is provided that effects substantially continuous charging to one or more devices and/or batteries, on a surface of the charger or power supply. The charger or power supply comprises: a plurality of coils arrayed in one or multiple layers to provide substantially continuous charging or to supply wireless power over an effective charging area of the surface of the charger or power supply, wherein the effective charging area is larger than a single coil surface area, and the coils are arrayed such that any location on the effective charging area is at a distance equal to or

> less than a radius or a side-to-center length of at least one coil. Ferromagnetic and/or electrically conductive layers or structures positioned within the charger or power supply shield components within the charger or power supply (or shield the nearby environment of the charger or power supply).

Claim 1 of the ’500 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

> 1. A system for inductive powering or charging of portable devices, the system comprising:
>
> one or more primary coils that are substantially planar and parallel to a surface of the system for powering or charging one or more compatible portable devices including batteries and receiver units, each receiver unit including a receiver coil and a receiver circuit including a receiver rectifier circuit;
>
> one or more drive circuits including one or more FET drivers, FET switches, and capacitors coupled to the one or more primary coils that when operated apply an alternating electrical current to the one or more primary coils to generate a magnetic field in a direction substantially perpendicular to the plane of the one or more primary coils and the surface of the system to provide power to the one or more portable devices capable of being powered or charged by the system when present and near the one or more primary coils;
>
> one or more sense circuits to monitor the current through the one or more primary coils to sense communications from the one or more receiver coils; and
>
> one or more communication and control circuits including one or more microcontrollers coupled to the one or more drive circuits and the one or more sense circuits that detect communications through the one or more sense circuits via the one or more primary coils and control the one or more drive circuits to control the powering or charging of the one or more compatible portable devices;
>
> wherein the one or more communication and control circuits:
>
> operate the one or more drive circuits *near a first resonant frequency* of a circuit formed by a primary coil and a drive circuit and a receiver coil and a receiver circuit of a compatible portable device when nearby;
>
> switch the one or more primary coils at a frequency and power level sufficient to transfer power to one or more of the receiver units when near the one or more primary coils for a sufficiently long period of time to activate the one or more receiver circuits and to receive a response from the one or more receiver circuits via the one or more receiver coils which the one or more primary

coils sense via the one or more sense circuits as a modulation of one or more primary coil currents;

detect, through the one or more sense circuits, communications from the one or more receiver units through the one or more receiver coils including information corresponding to one or more voltages at one or more outputs of the receiver rectifier circuits induced by the one or more primary coils and receiver coil and information associated with the one or more portable devices and/or receiver units to enable the one or more communication and control circuits to identify the one or more portable devices and/or receiver units and to determine any one or more appropriate charging or powering algorithm profiles therefor;

for each portable device, determine the primary coil electromagnetically most aligned with the receiver coil of the portable device;

drive the one or more FET switches associated with the most aligned one or more primary coils;

periodically receive information corresponding to one or more output voltages or currents of the one or more receiver rectifier circuits via the one or more primary coils and the one or more sense circuits; and

regulate in a closed loop feedback manner the one or more output voltages or currents of the one or more receiver rectifier circuits by adjusting the frequency or duty cycle of the one or more drive circuits during the charging or powering of the one or more portable devices.

The Abstract of the ’371 Patent states:

> A system for providing power inductively to a portable device. The system includes a primary coil, a drive circuit, a sense circuit, and a communication and control circuit. The communication and control circuit is configured to perform operations, including detection of communication and drive circuit operations. A portable device that includes a receiver unit coupled to a battery and configured to receive inductive power from an inductive charging system including a base unit with a primary coil and associated circuit The receiver unit includes a receiver coil, a ferromagnetic layer, and a receiver circuit. The receiver circuit includes a receiver communication and control circuit to modulate current in the receiver coil to communicate with a base unit while the receiver circuit is being powered by the inductive charging system.

Claim 1 of the ’371 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

1.An apparatus comprising:

a system for providing power inductively to a portable device comprising a battery and an inductive receiver unit including a receiver coil and a receiver circuit, the system comprising:

a first primary coil that is substantially planar and substantially parallel to a surface of the system for providing power inductively to the portable device;

a first drive circuit, including a FET driver, a capacitor, and a FET switch, coupled to a DC voltage input and coupled to the first primary coil, wherein during operation the first drive circuit is configured to apply an alternating electrical current to the first primary coil at an operating frequency and duty cycle to generate an alternating magnetic field in a direction substantially perpendicular to the plane of the first primary coil and the surface of the system to provide power inductively to the portable device, wherein the operating frequency is within a range of frequencies (i) that are *near a resonance frequency* of a circuit comprising the first primary coil and the capacitor, (ii) such that increasing values of the operating frequency within the range of frequencies would correspond to a lower voltage or current induced in an output of the receiver circuit and (iii) that allow activation and powering of the receiver unit and charging the battery of the portable device;

a first sense circuit to monitor current flow through the first primary coil during operation of the first drive circuit, wherein the first sense circuit includes a low pass filter and an amplifier to assist in detecting and amplifying a signal corresponding to a current modulation in the first primary coil induced by modulation of current in the receiver coil; and

a communication and control circuit, including a microcontroller coupled to the first drive circuit and the first sense circuit, configured to:

detect, through the first sense circuit, a received communication of information in the current modulation in the first primary coil;

operate the first drive circuit to inductively transfer power from the first primary coil to the receiver coil to activate and power the receiver unit to enable the receiver circuit to communicate the information detected in the current modulation in the first primary coil, wherein the communication of information includes information to enable the communication and control circuit to configure the inductive transfer of power to the portable device, wherein the received communication of information includes:

information corresponding to a voltage or current induced by the first primary coil at the output of the receiver circuit;

a unique identification code;

a manufacturer code;
a charge algorithm profile; and
a power requirement; and
operate the first drive circuit according to the power requirement and charge algorithm profile to provide the power from the first primary coil to the receiver coil to power the receiver unit and charge the battery of the portable device, wherein to charge the battery of the portable device the communication and control circuit is further configured to:
receive additional information in the current modulation in the first primary coil from the modulation of the current in the receiver coil corresponding to the voltage or current at the output of the receiver circuit while charging the battery of the portable device;
regulate in a closed loop feedback manner the voltage or current at the output of the receiver circuit in accordance with the received additional information corresponding to the voltage or current at the output of the receiver circuit by adjusting at least one of the operating frequency and the duty cycle of the first drive circuit while charging the battery of the portable device;
monitor for continued presence of the portable device and completion of the charging of the battery of the portable device based on the communication from the receiver circuit and detected by the communication and control circuit through the first sense circuit; and
if the portable device is no longer present or charging is complete, stop operation of the first drive circuit for the provision of power inductively to the portable device.

The Abstract of the ’942 Patent states:

> A system for providing power inductively to a portable device is disclosed. The system a primary coil, a drive circuit, a sense circuit, and a communication and control circuit. The communication and control circuit is configured to perform operations, including detection of communication and drive circuit operations. A portable device that includes a receiver unit coupled to a battery and configured to receive inductive power from an inductive charging system including a base unit with a primary coil and associated circuit is also disclosed. The receiver unit includes a receiver coil, a ferrite layer, and a receiver circuit. The receiver circuit includes a receiver communication and control circuit to modulate current in the receiver coil to communicate with a base unit while the receiver circuit is being powered by the inductive charging system.

Claim 1 of the '942 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

> 1.A system for providing power inductively to a portable device comprising a battery and an inductive receiver unit including a receiver coil and a receiver circuit, the system comprising:
>
> a first primary coil that is substantially planar and substantially parallel to a charging surface of the system for providing power inductively to the portable device;
>
> a first drive circuit, including a FET driver, a capacitor, and a FET switch, coupled to a DC voltage input and coupled to the first primary coil, wherein during operation the first drive circuit is configured to apply an alternating electrical current to the first primary coil at an operating frequency and duty cycle to generate an alternating magnetic field in a direction substantially perpendicular to the plane of the first primary coil and the charging surface of the system to provide power inductively to the portable device, wherein the operating frequency is within a range of frequencies (i) that are *near a resonance frequency* of a circuit comprising the first primary coil and the capacitor, (ii) such that increasing values of the operating frequency within the range of frequencies would correspond to a lower voltage or current induced in an output of the receiver circuit and (iii) that allow activation and powering of the receiver unit and charging the battery of the portable device;
>
> a first sense circuit, including a low pass filter and an amplifier, coupled to the first primary coil to detect communication of information induced in the first primary coil by the receiver coil; and
>
> a communication and control circuit, including a microcontroller coupled to the first drive circuit and the first sense circuit, configured to:
>
> detect, through the first sense circuit, a received communication of information in the first primary coil;
>
> operate the first drive circuit to inductively transfer power from the first primary coil to the receiver coil to activate and power the receiver unit to enable the receiver circuit to communicate the information detected in the first primary coil via the first sense circuit, wherein the received communication of information includes information to enable the communication and control circuit to configure the inductive transfer of power to the portable device, wherein the received communication of information includes:
>
> information corresponding to a voltage or current induced by the first primary coil at the output of the receiver circuit;

> a unique identification code; and
> a power requirement; and
> operate the first drive circuit according to the power requirement to provide the power from the first primary coil to the receiver coil to power the receiver unit and charge the battery of the portable device, wherein to charge the battery of the portable device the communication and control circuit is further configured to:
> receive additional information in the first primary coil corresponding to the voltage or current at the output of the receiver circuit while charging the battery of the portable device;
> regulate in a closed loop feedback manner the voltage or current at the output of the receiver circuit in accordance with the received additional information corresponding to the voltage or current at the output of the receiver circuit by adjusting at least one of the operating frequency, the duty cycle, and a DC voltage at the DC voltage input of the first drive circuit while charging the battery of the portable device;
> monitor for continued presence of the portable device and completion of the charging of the battery of the portable device detected by the communication and control circuit through the first sense circuit; and
> if the portable device is no longer present or charging is complete, stop operation of the first drive circuit for the provision of power inductively to the portable device.

The ’349 Patent, titled “System and Method for Powering or Charging Receivers or Devices Having Small Surface Areas or Volumes,” was filed on September 3, 2021, and issued on April 5, 2022. The ’349 Patent relates to “systems and methods for enabling transfer of power, from a wireless charger or power supply, to one or more receivers placed on or near the wireless charger or power supply, including powering or charging one or multiple receivers or devices having small surface areas or volumes.” ’349 Patent at 1:54–58.

The Abstract of the ’349 Patent states:

> A system for inductive power transfer includes a charger. The charger is an inductive charger. The system also includes a first mobile device that includes a receiver to inductively receive power for the first mobile device. A charger for inductive charging includes a printed circuit board having a charger coil, a substantially planar

> magnetic layer, a charger drive circuit, and means for positioning a receiver in a power transfer position. A mobile device that receives power inductively includes a receiver to inductively receive power for the mobile device. A method for inductive power transfer to a mobile device, which includes a receiver, includes positioning the receiver in a power transfer position to inductively receive power from an inductive charger. The method further includes inductively transferring power from the charger to the receiver of the first mobile device.

Claim 1 of the '349 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

> 1.A system for inductive power transfer comprising:
>
> a charger, wherein the charger is an inductive charger, and the charger includes:
>
> a printed circuit board having a charger coil, wherein the charger coil has a substantially planar charger surface;
>
> a substantially planar magnetic layer under the charger coil opposite the charger surface; and
>
> a charger drive circuit, wherein the charger drive circuit includes a resonant capacitor and a FET switch to apply an alternating voltage to the charger coil; and
>
> a first mobile device that includes a receiver to inductively receive power for the first mobile device, wherein the receiver includes:
>
> a solenoid, wherein the solenoid includes:
>
> a magnetic core having a relative magnetic permeability exceeding 1 and having first and second ends; and
>
> Litz wire wrapped around a section of the magnetic core forming a wire wound section around the magnetic core, with the magnetic core extending beyond the wire wound section; and
>
> a receiver electronic circuit, wherein the receiver electronic circuit includes a resonant capacitor and a rectifier; and
>
> wherein:
>
> the charger further includes a means for positioning the receiver in a power transfer position, proximate to the charger surface, to inductively transfer power to the receiver of the first mobile device;
>
> the charger drive circuit is configured to drive the charger coil at one or more operating frequencies to inductively transfer power from the charger to the receiver when the receiver is positioned in the power transfer position, wherein when the receiver is positioned in the power transfer position, a tuned circuit, including the charger coil and the resonant capacitor

of the charger drive circuit and the solenoid and the resonant capacitor of the receiver electronic circuit, has a resonant frequency that allows the charger to transfer the power to the receiver at the one or more operating frequencies;

the charger coil includes a conductor patterned to include multiple, substantially concentric turns for generating a magnetic flux through a first end of the solenoid when the receiver is placed in the power transfer position, wherein an outermost of the concentric turns defines a perimeter of a charger coil area;

the multiple concentric turns, when driven by the charger drive circuit, generate a magnetic field that is substantially perpendicular to the charger surface at a geometric center of the charger coil area,

the charger coil area is larger than an area of the first end and larger than an area of the second end of the magnetic core of the solenoid;

the magnetic layer of the charger extends beyond the charger coil area; and

when the receiver is in the power transfer position, the first end of the magnetic core is located proximate to the charger coil area above the charger surface to receive magnetic flux from the charger coil area and guide the magnetic flux in a closed magnetic loop from the charger coil area through the solenoid and return through the charger magnetic layer to the charger coil area to form the closed magnetic loop.

## II. APPLICABLE LAW

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at

861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*,

299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.*

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

### B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d

[2] Some cases have characterized other principles of claim construction as "exceptions" to the

1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C. Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty."

general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

*Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013) (citations omitted). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

### D. Means-Plus-Function Limitations

Where a claim limitation is expressed in "means plus function" language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112, ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112, ¶ 6 mandates that "such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* (citing 35 U.S.C. § 112, ¶ 6). Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves multiple steps. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* Moreover, the focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.*

## III. LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art. *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). The Federal Circuit has advised that the "[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Plaintiff's expert, Dr. Ricketts, opines that a person of ordinary skill in the art ("POSITA")

in the technology field of the Patents-in-Suit would have had a bachelor's degree in electrical engineering, computer engineering, applied physics, or a related field, and at least one year of experience in the research, design, development, and/or testing of wireless charging systems, or the equivalent. (Dkt. No. 57-12 at ¶ 26).

Defendants' expert, Dr. Zane, opines that a person of ordinary skill in the art, a POSITA, at the time of the claimed priority dates would have had at least a master's degree in electrical engineering, or a similar discipline, and two or more years of experience with wireless charging systems, including, for example, inductive power transfer systems. (Dkt. No. 57-8 at ¶ 33)

Having considered the parties' proposals, and the factors that may be considered in determining the level of skill in the art, the Court finds that a person of ordinary skill in the art would have at least bachelor's degree in electrical engineering, computer engineering, applied physics, or a related field, and at least one year of experience in the research, design, development, and/or testing of wireless charging systems, or the equivalent. The Court finds that any differences in the parties' proposals do not appear to be significant for the purpose of claim construction.

## IV. CONSTRUCTION OF AGREED TERMS

During the claim construction hearing, the parties agreed to the construction of the following terms:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "for each portable device, determine the primary coil electromagnetically most aligned with the receiver coil of the portable device"<br><br>'500 Patent: Claim 1 | "for each portable device, determine the primary coil providing the highest power transfer efficiency with the receiver coil of the portable device" |

In view of the parties' agreement on the proper construction of the identified terms, the Court hereby **ADOPTS** the parties' agreed constructions.

## V. CONSTRUCTION OF DISPUTED TERMS

The parties dispute the meaning and scope of eight terms or phrases in the Asserted Patents. Each dispute is addressed below.

### A. "near a first resonant frequency"; "near a resonant frequency"; "near the resonance frequency"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "near a first resonant frequency"; "near a resonant frequency"; "near the resonance frequency" | P&O: no construction needed and not indefinite.<br>A POSITA would understand that in the context of the 500, 371, 942, and 349 patents, "near a resonant frequency" is sufficiently close so that the existence of the resonance frequency has a significant effect on operation of the system. For example, operating near the resonant frequency provides a high-level of coupling for energy transfer and is responsive to frequency variations. | Indefinite. |

#### 1. Analysis

The term "near a first resonant frequency" appears in Asserted Claim 1 of the '500 Patent. The term "near a resonant frequency" appears in Asserted Claim 23 of the '500 Patent. The term "near a resonance frequency" appears in Asserted Claim 1 of the '371 Patent; and Asserted Claim 1 of the '942 Patent. The term "near the resonance frequency" appears in Asserted Claim 4 of the '349 Patent. [3]. The Court finds that the terms are used consistently in the claims and are intended to have the same general meaning in each claim. The parties do not dispute the meaning of the term "resonant frequency" or "resonance frequency." The 349 Patent describes how to calculate the resonant frequency for an LC circuit.

---

[3] On February 16, 2024, Plaintiff notified the Court that it was no longer asserting any claims of U.S. Patent No. 11,292,349 (the "'349 Patent"). (Dkt. No. 72). Plaintiff further stated that the parties agreed that certain claim terms were no longer in dispute as to claim construction. (*Id.* at 2.). Accordingly, with the exception of term "near the resonance frequency" recited in the '349 Patent, the Court will not construe the other terms identified in the Notice of Focusing of Patent Claims (Dkt. No. 72).

> The resonant frequency, F of any LC circuit is given by:
>
> $$F = \frac{1}{2\pi\sqrt{LC}}$$
>
> Where L is the Inductance of the circuit or coil in Henry and C is the Capacitance in Farad.

’349 Patent at 18:48–56 (highlight added). The parties further agree that the following figure demonstrates how a resonant frequency will normally have an effect on the operation of a system at any operating frequency. (Dkt. No. 61 at 19) (citing Dkt. No. 57-8 at ¶ 68).




Specifically, the parties agree that “changing the operating frequency above the resonance frequency decreases the power transfer, and how the slope (rate of change in the ratio of the receiver rectifier output and the operating frequency) decreases as the operating frequency moves further from the resonance frequency,” as shown in the figure above. (Dkt. No. 61 at 19) (citing

Dkt. No. 57-8 at ¶ 68).

Defendants argue that the intrinsic record provides no guidance on where along the above curve the operating frequency is "near" or "sufficiently close" to the resonant frequency so that the resonance frequency has a "significant effect" on operation. (Dkt. No. 61 at 19-20). Defendants contend that for a subjective term of degree like "near" to be definite, the specification must provide "some standard for measuring that degree." *Id.* at 16-17 (citing *GE Lighting Sols., LLC v. Lights of Am., Inc.*, 663 F. App'x 938, 940 (Fed. Cir. 2016)).

The Court finds Defendants' argument unpersuasive, because it fails to consider the disputed term in the context of the surrounding claim language. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim."); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) ("[I]n all aspects of claim construction, 'the name of the game is the claim.'") (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998) (overruled on other grounds by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)). Accordingly, the Court rejects Defendants' attempt to focus on the term "near resonance" in isolation without viewing it in the context of the entire claim.

Starting with Claim 4 of the '349 Patent, the claim itself specifies a specific efficiency, which provides some standard for measuring the degree of near. Specifically, Claim 4 of the '349 Patent recites "wherein when the receiver is positioned in the power transfer position and when the charger is *operated at an operating frequency near the resonance frequency* of the tuned circuit to inductively transfer power from the charger to the receiver, the transfer of power from the charger to the receiver *has a power transfer efficiency that exceeds 50%.*" The claim further recites that "the power transfer efficiency is defined by power out of a rectifier in the receiver electronic

circuit divided by power into the charger drive circuit." Thus, Claim 4 provides guidance and explains that operating at near the resonant frequency results in a power transfer efficiency that exceeds 50%.

Similarly, Claim 1 of the '371 Patent recites "during operation the first drive circuit … the operating frequency is within a range of frequencies (i) that are *near a resonance frequency* of a circuit comprising … (ii) *such that* increasing values of the operating frequency within the range of frequencies would correspond to a lower voltage or current induced in an output of the receiver circuit and (iii) that *allow activation and powering of the receiver unit and charging the battery of the portable device.*" Likewise, Claim 1 of the '942 Patent recites "wherein during operation the first drive circuit … the operating frequency is within a range of frequencies (i) that are *near a resonance frequency* of a circuit … (ii) *such that* increasing values of the operating frequency within the range of frequencies would correspond to a lower voltage or current induced in an output of the receiver circuit and (iii) that *allow activation and powering of the receiver unit and charging the battery of the portable device*." Finally, Claim 1 of the '500 Patent recites operating "the one or more drive circuits *near a first resonant frequency* of a circuit formed by a primary coil … switch[ing] the one or more primary coils at a frequency and power level *sufficient to transfer power* to one or more of the receiver units when near the one or more primary coils *for a sufficiently long period of time to activate the one or more receiver circuits.*" Thus, the claims specify that the inductive energy transfer must be able to activate and power the receiver circuit and charge the battery of the mobile device. Accordingly, the claims provide guidance and "some standard for measuring that degree." *GE Lighting*, 663 F. App'x at 940.

The specifications also provide guidance as to the scope of the term "near." For example, the '500, '371, and '942 Patent each explain that "the frequency … can be changed to move the

circuit into, and out of, resonance to create the appropriate voltage in the receiver" and that "[h]igher drive frequency corresponds to lower output power … and lower frequency corresponds to higher output power." '500 Patent at 14:35–45, 33:33–35; '371 Patent at 15:26–39, 34:34–35; '942 Patent at 17:64–18:10. Furthermore, the '349 Patent describes how to calculate the resonant frequency and explains that "[o]perating near this resonance point, efficient power transfer across from the transmitter to the receiver coil can be achieved." '349 Patent at 13:18–20. The specification further states that the "efficiencies of over 50% up to near 80% have been reported." *Id.* at 13:20–23.

In summary, the intrinsic evidence provides sufficient context for a person of ordinary skill in the art to understand the disputed terms with "reasonable certainty." *Nautilus*, 572 U.S. at 910. Accordingly, the Court finds that Defendants failed to prove by clear and convincing evidence that the term is indefinite. Finally, the Court has considered the remaining extrinsic evidence submitted by the parties, and given it its proper weight in light of the intrinsic evidence.

#### 2. Court's Construction

For the reasons set forth above, the terms **"near a first resonant frequency," "near a resonant frequency," "near a resonance frequency,"** and **"near the resonance frequency"** are given their **plain and ordinary meaning.**

### B. "power parameter"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "power parameter" | P&O: no construction needed and not indefinite. In the context in each patent and claim in which the term appears, a POSITA would understand that the term refers to an aspect or element of power | Indefinite. |

#### 1. Analysis

The term "power parameter" appears in Asserted Claim 1 of the '208 Patent; and Asserted

Claims 28 and 30 of the ’371. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term “power parameter” is indefinite.

Defendants argue that the term “power parameter” is indefinite because a POSITA would not understand the scope of the term with reasonable certainty. (Dkt. No. 61 at 34) (citing Dkt. No. 57-8 at ¶¶ 111–123). Defendants contend that the different claims ascribe different apparent scopes to the term “power parameter.” *Id*. Defendants argue that Claim 1 of the ’208 Patent indicates that a power parameter includes voltage and current values. *Id.* (citing ’208 Patent at 27:15–27 (“a value of a required voltage, current, or other power parameter”); Dkt. No. 57-8 at ¶ 116). Defendants contrast this with Claim 30 of the ’371 Patent that they contend indicates that “voltage” and “current” values are not power parameters. (Dkt. No. 61 at 34) (citing ’371 Patent at 80:40–46 (“a power parameter and a voltage or current value”)). According to Defendants, a POSITA would not understand the scope of a “power parameter” with reasonable certainty based on the claims, including whether it includes or excludes voltage and current values. (Dkt. No. 61 at 35).

The term “power parameter” does not appear in the specifications of the ’208 or ’371 Patents, and appears in the specification of the ’942 Patent only twice. ’942 Patent at 7:29, 7:32. However, this does not mean that the term is indefinite, because the intrinsic record informs those skilled in the art about the scope of the invention with reasonable certainty. All of the Asserted Claims relate to a system or portable device that is charged inductively. ’208 Patent at Claim 1 (“charge or power the device and/or battery”); ’371 Patent at Claim 28 (“charge the battery of the portable device”); ’371 Patent at Claim 30 (“charge the battery of the portable device”).

Specifically, the Asserted Claims recite that the base unit (the wireless charger) uses a

power parameter of the portable or mobile device (the wireless power receiver). '208 Patent at 27:22–24; '371 Patent at 79:30–35, 80:43. This helps the base unit understand the needs of the device that is being wirelessly charged and powered. Accordingly, a POSITA would understand that a "power parameter" is a "parameter related to charging or powering a device."

Indeed, Claim 1 of '208 Patent recites that voltage and current are power parameters. Specifically, the claim recites that "a required voltage, current, or other power parameter for the mobile, electronic, or other device and/or battery, battery door, or skin for use with the device." Defendants' expert concedes that "[t]he claims instruct that voltage and current are power parameters." (Dkt. No. 57-8 at ¶ 116). Likewise, other claims of the '371 Patent specify a "power requirement," which is another example of a power parameter. '371 Patent at Claim 1.

The specification further indicates that a "power parameter" is a "parameter related to charging or powering a device." In one embodiment, the specification states that "[t]he mobile device charger, after exchanging information with the mobile device, determines the appropriate charging/powering conditions to the mobile device," and "then proceeds to power the mobile device with the appropriate parameters required." '208 Patent at 8:34–38; '371 Patent at 13:28–33. Similarly, the specification states that a regulator or charge management circuit "can sense the appropriate parameters of the battery (voltage, current, capacity), and regulate the current drawn from the receiver appropriately." '208 Patent at 6:16–20; '371 Patent at 10:20–26. The specifications also provides examples of "power parameters" as "the devices' charging/power requirements (such as its required voltage, battery capacity, and charge algorithm profile)." '208 Patent at 7:17–19; '371 Patent at 11:37–39. The specifications further explain that the charging profile can include parameters. '208 Patent at 7:44–47; '371 Patent at 12:6–10. The specifications further equates parameters with characteristics by stating that "each mobile device and its battery

have particular characteristics (voltage, capacity, etc.)." '208 Patent at 8:5–6, 10:30; '371 Patent at 12:40–41, 15:18–19.

The specifications further describe other power parameters as "the duty cycle, frequency, and/or voltage of the switch." '208 Patent at 10:46–48; '371 Patent at 15:36–39. Similarly, the specifications state that the circuit can measure "the various parameters of the battery (voltage, degree of charging, temperature, etc.) and uses an internal program to regulate the power drawn from the circuit to ensure over-charging does not occur." '208 Patent at 10:59–62; '371 Patent at 15:50–54. The specifications also discuss the use of wattage to measure output power specifications, giving an example where "a total output power of 60 Watts can be achieved." '208 Patent at 9:20–21; '371 Patent at 14:22–23. Wattage capacity is another example of a power parameter that is consistent with the usage of the term in the specification. Accordingly, a POSITA would understand that a "power parameter" is a "parameter related to charging or powering a device."

Defendants argue that a POSITA would not understand the scope of a "power parameter" with reasonable certainty based on the claims, including whether it includes or excludes voltage and current values. According to Defendants, Claim 30 of the '371 Patent indicates that a "power parameter" is something other than a voltage or current. The Court disagrees. As discussed above, the intrinsic evidence indicates that a power parameter may be a voltage or current**,** or one of the other parameters related to charging or powering a device.

Defendants cite to *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014), and argue that "even if the cited examples are power parameters, that is still not enough to make the term definite because examples do not define a subjective term's outer bounds." (Dkt. No. 61 at 35). The Court finds that *Interval Licensing* is inapposite, because it addressed a "purely

subjective" claim phrase, unlike the "power parameter" term that would be understandable to a POSITA. *See Interval Licensing*, 766 F.3d at 1371 (stating that the term "'unobtrusive manner' phrase is highly subjective and, on its face, provides little guidance to one of skill in the art."). Even for "purely subjective" claim phrases, the Federal Circuit "recognize[d] that a patent which defines a claim phrase through examples may satisfy the definiteness requirement." *Id*. at 1373. Accordingly, the Court finds that Defendants failed to prove by clear and convincing evidence that the term is indefinite. Finally, the Court has considered the remaining extrinsic evidence submitted by the parties, and given it its proper weight in light of the intrinsic evidence.

**2. Court's Construction**

For the reasons set forth above, the Court construes the term **"power parameter"** to mean **"parameter related to charging or powering a device."**

**C. "a voltage regulator coupled to an output of the receiver rectifier circuit and coupled to the microcontroller"**

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "a voltage regulator coupled to an output of the receiver rectifier circuit and coupled to the microcontroller" | P&O: no construction needed. A POSITA would understand this term in light of the entire claim element language "a voltage regulator coupled to an output of the receiver rectifier circuit and coupled to the microcontroller to provide a regulated voltage to power the microcontroller from the received inductive power." The voltage regulator is coupled to the output receiver rectifier circuit to receive power therefrom and is coupled to the microcontroller to provide a regulated voltage thereto, thus powering the microcontroller by the received inductive power | "a voltage regulator directly connected to an output of the receiver rectifier circuit and directly connected to the microcontroller" |

**1. Analysis**

The phrase "a voltage regulator coupled to an output of the receiver rectifier circuit and coupled to the microcontroller" appears in Asserted Claim 21 of the '942 Patent. The Court finds

that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. Defendants argue that the claims specify that the regulator is "coupled to an output of the receiver rectifier circuit," and that the same regulator is also "coupled to the microcontroller." (Dkt. No. 61 at 11). According to Defendants, these components directly connect to each other so that wirelessly received AC power is rectified and output as DC power to a regulator, which then outputs the required amount of power for the microcontroller to function properly. *Id.*

Defendants also argue that the patents' figures only disclose direct connections between the receiver rectifier circuit, the voltage regulator, and the microcontroller without other intervening components. (Dkt. No. 61 at 12) (citing '371 Patent at Figures 24, 28–29, 34, 46, 49; '942 Patent at Figures 24, 28–29, 34, 46, 49).




Finally, Defendants contend that the patentee amended claims of the '440 Patent to specify that the regulator is "coupled to the output of the receiver or the battery." (Dkt. No. 61 at 13) (citing Dkt. No. 61-3 at 6-8, 18, 27). However, Defendants also state in a footnote, that "[e]ven if the file history does not show a disclaimer, it still supports Samsung's construction." (Dkt. No. 61

at 13 n.4).

The Court finds that Defendants have not identified a definition or disavowal that would justify limiting the ordinary meaning of "coupled to" to a direct connection. Indeed, the claim language itself indicates that the term "coupled to" should not be limited to "directly connected." Claim 21 of the '942 Patent reciteS "a voltage regulator coupled to an output of the receiver rectifier circuit," and a "battery charging circuit … coupled to the output of the receiver rectifier circuit." If "coupled to" required "directly connected," then the embodiment illustrated in Figure 24 would not fall within the scope of the claims, because it only illustrates the regulator "directly connected" to the "receiver rectifier circuit," as characterized and annotated by Defendants. Accordingly, it would be "improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

Defendants also cite to the prosecution history of the '440 Patent where the patentees stated that the regulator is coupled to the output of the receiver or the battery.

> It was further asserted that Jung does not disclose explicitly, wherein a regulator senses one or more of a current drawn from the receiver, or an output voltage or output current provided to the mobile device or the battery; but that Lyon discloses, in Figures 1-2, a regulator that senses one or more of a current drawn from the receiver, or an output voltage or output current provided to the mobile device or the battery; and that it would have been obvious to a person having ordinary skill in the art, at the time the invention was made, to modify controller of Jung and allow to regulate the charging current or voltage as taught by Lyon in order to improve magnetic coupling between the charger and the device necessary for charging.
>
> However, Applicant respectfully submits that, based on the above description, in Jung and Lyon, the controller and input frequency controller respectively appear to be provided at the charging pad and charger respectively, rather than, for example, at a mobile device.

(Dkt. No. 61 at 13) (citing Dkt. No. 61-3 at 27) (highlight added). It is well settled that a disclaimer

must be clear and unmistakable, and "unclear prosecution history cannot be used to limit claims." *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009). The identified amendments and statements made by the patentees do not clearly and unmistakably limit "coupled to" to "directly connected." Accordingly, the Court rejects Defendants' construction. The term "coupled to" is unambiguous, is easily understandable by a jury, and should be given its plain and ordinary meaning. Finally, the Court has considered the remaining extrinsic evidence submitted by the parties, and given it its proper weight in light of the intrinsic evidence.

#### 2. Court's Construction

For the reasons set forth above, the phrase **"a voltage regulator coupled to an output of the receiver rectifier circuit and coupled to the microcontroller"** is given its **plain and ordinary meaning.**

### D. "a means for avoiding overcharging one or both of the mobile device and battery inductively"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "a means for avoiding overcharging one or both of the mobile device and battery inductively" | **Function:** avoiding overcharging one or both of the mobile device and battery inductively.<br>**Structure:** (1) battery regulator chip;<br>(2) circuitry that measures parameters of the battery, such as voltage, degree of charging, temperature, etc., and regulates power drawn;<br>(3) circuitry that uses a hand shake and verification process to indicate power/voltage requirements;<br>(4) circuitry that regulates the current and the load to charge the battery correctly;<br>(5) circuitry to end charge at the end of charging; or<br>(6) equivalents of any of the above. | **Function**: avoiding overcharging one or both of the mobile device and battery inductively<br>**Structure**: a battery regulator chip and/or a circuit that measures parameters of a battery (e.g., voltage, degree of charging, temperature, etc.) and uses an internal program to regulate the power drawn from a circuit to ensure overcharging does not occur (where the circuit could also include LEDs to show the receiver being in the presence of a magnetic field from the charger, complete charge LEDs and/or audible signals), or equivalents thereof |

**1. Analysis**

The phrase "a means for avoiding overcharging one or both of the mobile device and battery inductively" appears in Asserted Claim 1 of the '440 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The parties agree that the phrase is a means-plus-function term governed by pre-AIA 35 U.S.C. § 112, ¶6. The parties also agree on the function. The parties dispute the corresponding structure.

The Court finds that the disputed phrase uses the words "means for" and specifies a function, thus the Court presumes that the patentees intended to invoke the statutory mandates for means-plus-function clauses. *York Prods. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1574 (Fed. Cir. 1996) ("In determining whether to apply the statutory procedures of section 112, ¶ 6, the use of the word 'means' triggers a presumption that the inventor used this term advisedly to invoke the statutory mandates for means-plus-function clauses."). "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic*, 248 F.3d at 1311. The Court finds, and the parties agree, that the recited function is "avoiding overcharging one or both of the mobile device and battery inductively."

Having determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Medtronic*, 248 F.3d at 1311. The term "overcharging" appears only two times in the specification, in the following paragraph:

> To avoid overcharging the battery, a battery regulator chip can also be used. This circuit then measures the various parameters of the battery (voltage, degree of charging, temperature, etc.) and uses an internal program to regulate the power drawn from the circuit to ensure over-charging does not occur. The circuit could also include LEDs to show the receiver being in the presence of a magnetic field from the charger, complete charge LEDs and/or audible signals.

'440 Patent at 11:8–16. Accordingly, the Court finds that this passage defines the corresponding

structure. Specifically, a battery regulator chip measures battery parameters, and "*this circuit*" (*i.e.*, the battery regulator chip) has "an *internal program* to regulate the power drawn from the circuit to ensure over-charging does not occur." *Id.* (emphasis added).

Turning to the parties' construction, Defendants' structure provides that the circuit could also include LEDs. The Court agrees that the specification states that the circuit *could* also include LEDs that provide information to the user. '440 Patent at 11:13–16. Therefore, the structure may include an LED, but one is not required to perform the claimed function of avoiding overcharging, as indicated by the specification's stating that the circuit "could" include an LED.

Plaintiff argues that the corresponding structure is not required to have the "internal program" structure for "ensur[ing] overcharging does not occur." Dkt. No. 57 at 15–16 (citing '440 Patent at 11:8–16). Contrary to Plaintiff's contention, the specification identifies the "internal program" as what makes the regulator chip capable of performing the claimed function of avoiding overcharging and differentiates the chip from a generic regulator. *See Apple Inc. v. Samsung Elecs. Co.*, 816 F.3d 788, 814 (Fed. Cir. 2016), vacated in part on other grounds on rehearing, 839 F.3d 1034 ("[B]ecause 'corresponding structure must include all structure that actually performs the recited function,' the district court correctly included software as part of the corresponding structure . . . ." (citations omitted)). Accordingly, the Court rejects Plaintiff's argument.

Regarding Plaintiff's construction, the Court finds that the proposed structures (3)–(5) improperly attempt to capture other structures and functions that are not clearly linked to the claimed function of avoiding overcharging. *Med. Instr. & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003) ("The requirement that structure must be clearly linked or associated with the claimed function is the *quid pro quo* for the convenience of claiming in functional terms."). For example, Plaintiff's structure (3) adds a "handshake and verification

process," but the specification only links that process to sharing "power/voltage" requirements from the mobile device to the charger, not to avoiding overcharging. '440 Patent at 9:40–45; Dkt. No. 57-8 at ¶ 46. Plaintiff's other proposed structures, (4) and (5), similarly lack a link to the specification's description of avoiding overcharging, and are therefore not within the scope of the claim when properly construed. *See B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1425 (Fed. Cir. 1997) (limiting means-plus-function claim to structure that clearly corresponds to claimed function; rejecting attempt to broaden claim to include structures that could perform function).

Moreover, Plaintiff's proposed structures (4) and (5) are actually functions that the specification identifies as being performed by a "regulator." '440 Patent at 13:1-3 ("The regulator in the receiver can then regulate the current and the load to charge the battery correctly and can end charge at the end."). The claims separately recite a regulator element "that regulates an output voltage or output current . . . to be within a range of parameters for the . . . battery." *See, e.g.*, '440 Patent at 27:27–31. Thus, construing the means for avoiding overcharging to have the claimed regulator would render the means limitation superfluous. Accordingly, the Court rejects this portion of Plaintiff's proposed corresponding structure.

**2. Court's Construction**

In light of the intrinsic evidence, the Court finds that the phrase **"means for avoiding overcharging one or both of the mobile device and battery inductively"** is governed by 35 U.S.C. § 112, ¶ 6, and construes the phrase as follows:

**<u>Function</u>: avoiding overcharging one or both of the mobile device and battery inductively.**

**<u>Corresponding Structure</u>: a battery regulator chip that measures parameters of a**

**battery (e.g., voltage, degree of charging, temperature, etc.) and uses an internal program to regulate the power drawn from a circuit to ensure overcharging does not occur (where the circuit could also include LEDs to show the receiver being in the presence of a magnetic field from the charger, complete charge LEDs and/or audible signals), or equivalents thereof.**

### E. "placed upon or close to"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "placed upon or close to" | P&O: no construction needed and not indefinite. A POSITA would understand that "close to" refers to the device being sufficiently close to allow for effective inductive power transfer, and that "aligned with" similarly refers to being sufficiently aligned to allow for effective inductive power transfer. | Indefinite. |

#### 1. Analysis

The term "placed upon or close to" appears in Asserted Claim 1 of the '208 Patent. The Court finds that the terms are used consistently in the claims and are intended to have the same general meaning in each claim. The parties dispute whether the phrase "placed upon or close to" is indefinite. Defendants argue that the scope of the phrase "close to" is unclear. (Dkt. No. 61 at 26). According to Defendants, the Asserted Claim uses "close to" in different contexts, but neither provides any guidance regarding the scope of the subjective term "close." *Id.* Defendants further argue that the term "close" is a term of degree, and that the Asserted Patents do not provide any objective standard for determining what "close" means in the context of the claims. *Id.* Defendants contend that there is no benchmark for determining what distance two devices become "close" in the context of the claims. *Id.* (citing Dkt. No. 57-8 at ¶¶ 86–92).

Defendants also argue that the specifications do not provide a POSITA with any guidance

or a benchmark for understanding the distance at which a transmitter and receiver would be "close." *Id.* (citing '208 Patent at 2:51, 9:54–61, 11:48–29, 16:30–34; '440 Patent at 7:59–61, 8:28–32, 16:53–56). Defendants contend that the specification sheds no light on what distances meet the language "close to." (Dkt. No. 61 at 27) (citing Dkt. No. 57-8 at ¶¶ 87, 91).

The Court finds Defendants' argument unpersuasive because it fails to consider the disputed term in the context of the surrounding claim language. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim."); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) ("[I]n all aspects of claim construction, 'the name of the game is the claim.'") (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998) (overruled on other grounds by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)). Claim 1 of the '208 Patent is directed to a charging system. The charging system includes a base unit, a power supply, and a communication interface. The disputed phrase appears in a claim element related to the capabilities of the communications interface. Specifically, Claim 1 recites "a communications interface that the base unit, and … the device, use to communicate with one another during powering or charging, to poll each of the primary coils, or receive a signal from a sensor associated therewith, to verify the presence of … the device placed upon or close to the surface of the base unit." Thus, a POSITA would understand with reasonable certainty that the communication interface must be capable of verifying the presence of the device when it is "placed upon or close to the surface of the base unit."

When properly considered, the surrounding claim language does not require the device to work at any particular distance, as long as it works with some devices placed "close to" the unit. Plaintiff persuasively argues that with wireless charging, the allowable distance may vary from

system to system, but the claim language does not require any *particular* distance to be met. (Dkt. No. 65 at 10). Instead, the system must be capable of working with a device that is placed upon or close to the unit. (Dkt. No. 65 at 10).

However, this does not mean that the claims are without bounds, because the claims and specification focus on higher-power mobile devices like cellular telephones, notebook computers, music players, or cameras, which would require more power and therefore closer proximity to the charger. '208 Patent at 1:32–39, 15:23–36. Given this context, the specification indicates what "close to" means by explaining that applying "the inductive charging technology to current and future electronic devices," it is desired that the receiver should work "*with the device in proximity (e.g. several millimeters to several centimeters) to the pad or charging device*." 208 Patent at 9:55–61 (emphasis added). Therefore, a POSITA would understand "close to" to mean "placed upon or within several millimeters to several centimeters." Accordingly, the term "closed to" "inform[s], with reasonable certainty, those skilled in the art about the scope of the invention,". *Nautilus*, 572 U.S. at 901. Finally, the Court has considered the remaining extrinsic evidence submitted by the parties, and given it its proper weight in light of the intrinsic evidence.

**2. Court's Construction**

For the reasons set forth above, the Court construes the terms **"placed upon or close to"** to mean **"placed upon or within several millimeters to several centimeters."**

**F. "universal base unit"**

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "universal base unit" | P&O: no construction needed and not indefinite. The phrase is clear in the full context of the claim and the patent, i.e., a base unit that can charge a variety of different mobile devices and/or batteries with different charging characteristics and/or with differing physical shapes. | Indefinite. |

**1. Analysis**

The term "universal base unit" appears in Asserted Claim 1 of the '440 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "universal base unit" is indefinite.

Defendants argue that the claims do not explain what "universal" means, and do not suggest charging batteries of different shapes. (Dkt. No. 61 at 31) (citing '440 Patent at 27:5–24, 27:51–61). Defendants further argue that the specification does not objectively explain what different devices or batteries a base unit must be able to charge to be "universal." (Dkt. No. 61 at 32) (citing Dkt. No. 57-8 at ¶¶ 104–08). Defendants contend that the alleged invention suggests the proposed "universal" charger should be usable with a large number of devices having different properties, but does not provide any required properties or property ranges. (Dkt. No. 61 at 32) (citing '440 Patent at 5:58–6:4).

Defendants further contend that Plaintiff made arguments during prosecution that indicate that a charger is not "universal" if it can charge devices from only one manufacturer.

> clearly demonstrates that all claims are nonobvious for numerous reasons. To illustrate, Applicant submits that not all charging systems are "universal" in nature. For example, Samsung smartphone chargers do not charge Apple iPhones, and Apple iPad chargers do not charge Samsung Galaxy smartphones. Thus, such universality renders all pending claims nonobvious.

(Dkt. No. 61 at 33) (citing Dkt. No. 61-3 at 54). Defendants argue that an Apple charger could charge an iPhone and iPad or other devices (*e.g.*, different shape devices with different shape/size batteries), which appears to make it "universal" under Plaintiff's interpretation. During the claim construction hearing, Defendants argued that this statement in the prosecution history is unclear. The Court agrees that the statement is unclear when considered in the context of the claim language (*i.e.*, inductive powering), and therefore does not rise to the level of a clear and unambiguous

disclaimer.

Defendants further contend that its expert, Dr. Zane, explained that another way a POSITA would understand "universal" is that the base unit is capable of wirelessly charging any receiver device. (Dkt. No. 61 at 33) (citing Dkt. No. 57-8 at ¶ 108). Defendants argue that with so many different ways to interpret "universal," it is unclear what the claims require. (Dkt. No. 61 at 33). The Court disagrees.

A claim, read in light of the intrinsic evidence, need only "inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901. Contrary to Defendants' argument, the intrinsic evidence confirms that a POSITA would understand that a "universal base unit" is one that can charge multiple different mobile devices and/or batteries with different charging characteristics. Specifically, the preambles of the Asserted Claims recite that the "universal base unit" is for charging "different mobile devices and/or batteries of different charging characteristics associated therewith." Moreover, the Asserted Claims recite "wherein different [mobile] devices and batteries can have different charging characteristics associated therewith." '440 Patent at Claims 1, 3, and 27.

Likewise, the specification describes that "[e]ach mobile device and its battery has particular characteristics (voltage, capacity, etc.)." '440 Patent at 8:38–39. The specification states that "[i]n order to facilitate these different devices with a single universal mobile device charger, several circuit architectures are possible, some of which are described in further detail below." *Id.* at 8:39–42. Accordingly, a POSITA would understand that a "universal base unit" is "a base unit that is capable of charging different mobile devices and/or batteries of different charging characteristics associated therewith," because this is the language recited in the claims. Accordingly, the Court finds that Defendants failed to prove by clear and convincing evidence that

the term is indefinite. The term "universal base unit" may be broad, but "breadth is not indefiniteness." *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017). Finally, the Court has considered the remaining extrinsic evidence submitted by the parties, and given it its proper weight in light of the intrinsic evidence.

**2. Court's Construction**

For the reasons set forth above, the Court construes the term **"universal base unit"** to mean **"a base unit capable of charging different mobile devices and/or batteries of different charging characteristics associated therewith."**

## VI. CONCLUSION

The Court adopts the constructions above for the disputed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 16th day of May, 2024.**



ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE