IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| MOJO MOBILITY, INC., | (  CAUSE NO. 2:22-CV-398-JRG |
| | ) |
| Plaintiff, | ( |
| | ) |
| vs. | ( |
| | ) |
| SAMSUNG ELECTRONICS CO., LTD., | ( |
| et al., | )  MARSHALL, TEXAS |
| | (  SEPTEMBER 12, 2024 |
| Defendants. | )  9:30 A.M. |

_____

VOLUME 5

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFF:    McKOOL SMITH, PC - AUSTIN
                      303 COLORADO ST., SUITE 2100
                      AUSTIN, TEXAS  78701
                      (512) 692-8702
                      BY:  MR. STEVEN POLLINGER
                           MR. GEORGE FISHBACK
                           MR. CHARLES FOWLER
                           MR. KENNETH SCOTT

                      McKOOL SMITH - WASHINGTON DC
                      1999 K ST. NW., SUITE 600
                      WASHINGTON, DC 20006
                      (202) 370-8323
                      BY:  MR. CHRISTOPHER McNETT

                      McKOOL SMITH - HOUSTON
                      600 TRAVIS STREET, SUITE 7000
                      HOUSTON, TEXAS  77002
                      (713) 485-7310
                      BY:  MR. NEIL OZARKAR
                           MR. RYAN McBETH

                      McKOOL SMITH, P.C. - MARSHALL
                      104 E. HOUSTON ST., SUITE 300
                      MARSHALL, TEXAS  75670
                      (903) 923-9000
                      BY: MR. SAMUEL BAXTER
                          MS. JENNIFER TRUELOVE
                          MR. KENNETH SCOTT

FOR THE DEFENDANTS:   PAUL HASTINGS, LLP - CHICAGO
                      71 SOUTH WACKER, 45TH FLOOR
                      CHICAGO, ILLINOIS  60606
                      (312) 499-6000
                      BY:  MR. ROBERT UNIKEL
                           MR. JOHN COTIGUALA

                      PAUL HASTINGS LLP - WASHINGTON
                      2050 M STREET NW
                      WASHINGTON, DC 20036
                      (202) 551-1700
                      BY:  MR. ALLAN SOOBERT
                           MR. DAVID VALENTE
                           MR. IGOR TIMOFEYEV
                           MR. JASON MIKUS
                           MR. KEVIN STEWART
                           MR. JAMES RAZICK

                        PAUL HASTINGS, LLP -
                        SAN FRANCISCO
                        101 CALIFORNIA ST., FLOOR 48
                        SAN FRANCISCO, CA  94111
                        (415) 856-7000
                        BY:  MR. MATTHIAS KAMBER

                        PAUL HASTINGS, LLP - SAN DIEGO
                        4655 EXECUTIVE DR., Ste. 350
                        SAN DIEGO, CALIFORNIA  92121
                        (858) 458-3000
                        BY:  MS. ELIZABETH BRANN
                             MS. SASHA VUJCIC

                        GILLAM & SMITH, LLP
                        102 N. COLLEGE, SUITE 800
                        TYLER, TEXAS  75702
                        (903) 934-8450
                        BY:  MR. TOM GORHAM
                             MR. TRAVIS UNDERWOOD

                        GILLAM & SMITH, LLP
                        303 SOUTH WASHINGTON AVENUE
                        MARSHALL, TEXAS  75670
                        (903) 934-8450
                        BY:  MS. MELISSA SMITH

OFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
                        100 E. HOUSTON STREET
                        MARSHALL, TEXAS  75670
                        (903) 923-8546

THE COURT:  Be seated, please.

Counsel, before I proceed to hear your motions under Rule 50(a) of the Federal Rules of Civil Procedure, let me ask if the parties are prepared to read into the record any additional exhibits used during yesterday's portion of the trial from the list of pre-admitted exhibits that have not previously been read into the record.

MR. FOWLER:  Yes, Your Honor.  We actually -- plaintiffs don't have any additional from yesterday that need to be read into the record.

THE COURT:  Counsel, you're going to have to speak up or go to the podium so I can hear you.  And identify yourself for the record first, please.

MR. FOWLER:  Charles Fowler for the Plaintiff.  And Plaintiffs do not have any additional exhibits to read into the record from yesterday.

THE COURT:  All right.  Thank you, Mr. Fowler.

Mr. Underwood, what's Defendants' position on this?

MR. UNDERWOOD:  The Defendants do have some exhibits to read, and with the Court's permission I'll do that now.

THE COURT:  Please do that.

MR. UNDERWOOD:  The Defendants' admitted exhibits from yesterday are:  DX 011, JX 180, JX 181, JX 182, JX 187, JX 188, JX 190, JX 191, JX 194, JX 196, JX 197, JX 207, and that completes the list.

1224

THE COURT:  All right.  Any objection to that rendition from the Plaintiff?

MR. FOWLER:  No objection, Your Honor.

THE COURT:  All right.  Thank you.

Let's now turn to motions from either party pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.

Counsel, for those of you not familiar with the Court's typical practice in that regard, what I would like to do is have a single spokesperson for Plaintiff and a single spokesperson for Defendant go to the podium.

I'd like you to first identify for me topically by subject matter the areas where you seek to obtain relief pursuant to Rule 50(a).  Then once I've identified your respective subject matter areas seeking relief, then I'll direct you as to how to present related argument.

The reason I do that is it's often the case that there are diametrically-opposing motions that can be argued together rather than separately, and it's more efficient that way.

So let's start with the Plaintiff.  Whoever's going to speak for Plaintiff, go to the podium and identify for me what matters, if any, that Plaintiff seeks to obtain relief on pursuant to Rule 50(a).

MR. FISHBACK:  Good morning, Your Honor.  George Fishback on behalf of Mojo Mobility.

Mojo seeks relief on four items:  first, that the

1225

asserted patents are valid; second, that the asserted patents are all infringed; third, that that infringement is willful; and, finally, that Mojo is entitled to a reasonable royalty.

THE COURT:  A reasonable royalty in the form of a running royalty or lump sum?

MR. FISHBACK:  A running royalty, Your Honor.  Thank you.

THE COURT:  Okay.

MR. FISHBACK:  And that will be it for Plaintiff.

THE COURT:  Thank you.

Let me hear a similar identification from the Defendants.

MR. KAMBER:  Good morning, Your Honor.  Matthias Kamber on behalf of Defendants.

Samsung is bringing five Rule 50(a) motions on infringement, we're bringing two non-infringement of all asserted claims, and no willful infringement.

On damages, there are two motions:  no damages for alleged infringement of the '440 Patent by the S6 through the S8 products and no damages for failure to apportion.

And then, finally, one motion on invalidity, that all of the asserted claims are obvious.

THE COURT:  All right.  Thank you, counsel.

Let's start then with the infringement/non-infringement motions.  Let me hear Plaintiff's argument as to their position on infringement, and then I'll hear corresponding

argument from Defendants on non-infringement.

MR. McNETT:  Thank you, Your Honor.  Chris McNett for Plaintiff Mojo Mobility.

We move under Rule 50(a) on infringement.  With respect to infringement, Mojo contends that no reasonable juror could find in favor of Samsung and that Mojo has shown infringement by a preponderance of the evidence because the evidence from Doctor Ricketts, Doctor Choi, and Doctor Partovi has conclusively shown that each claim element is present in each Samsung accused product.

Thank you.

THE COURT:  Thank you.

What's the corresponding argument from Defendants?

MR. KAMBER:  Your Honor, Defendants oppose Plaintiff's motion on the basis of the evidence presented in this case by the fact witnesses Mr. Lee and Doctor Choi regarding the operation of those products as well as the evidence presented by Doctor Zane and the cross examination of Doctor Ricketts.

THE COURT:  All right.  Anything further on this topic, Mr. Kamber?

MR. KAMBER:  Just with respect to Defendants' motion, Your Honor, there are four reasons for it.  For the '440 Patent, we move because Samsung's products don't practice authentication.  For the '942 and '500 Patents, Samsung's

products do not operate near the resonant frequency.  For the '942 and '371 Patents, Samsung's products don't sense current or control current.  And for the '777 Patent, Samsung's products don't use uni-directional communication; they use bi-directional.

THE COURT:  All right.  Thank you.

Let's turn to the validity/invalidity issue.  Plaintiffs have moved for judgment as a matter of law that all of the asserted patents are valid, and Defendants have moved for judgment as a matter of law that all of the asserted patents are obvious under section 103 and, therefore, invalid.

Given that Defendants have the burden of proof on the invalidity issue, let me hear Defendants' argument first, and then I'll follow up with corresponding argument from Plaintiff.

MR. KAMBER:  Thank you, Your Honor.

With respect to invalidity and obviousness, Defendants presented evidence through Doctor Zane regarding the obviousness to one of skill in the art of the asserted claims based on the prior art, and that evidence stands unrebutted in this case by the failure to present any rebuttal from Doctor Ricketts.

THE COURT:  All right.

MR. KAMBER:  Thank you, Your Honor.

THE COURT:  Thank you.

1228

What's the argument from Plaintiff on this topic?

MR. SCOTT:  Your Honor, Kevin Scott for Plaintiff Mojo Mobility.

We oppose Samsung's 50(a) motion on the issue of invalidity because there exists a legally sufficient evidentiary basis for a reasonable jury to find for Mojo.  We hereby cross move under Rule 50(a) under -- on the issue of the patents' validity because there exists no reasonable -- no evidentiary basis for a reasonable jury to find for Samsung on the issue of validity.

THE COURT:  All right.  Thank you.

Let's next turn to the issue of willfulness.  Plaintiffs have sought relief that infringement, if any, is willful.  Defendants have sought relief under Rule 50(a) that infringement, if any, is not willful.

Let me hear from Plaintiff on this first, and then I'll hear from Defendant.

MR. FISHBACK:  Thank you, Your Honor.

Presented at trial over the course of the trial is an overwhelming amount of evidence that Samsung knew of the patents and acted intentionally, recklessly, or willfully blind of their infringement.

Doctor Partovi testified that Samsung was provided the patent list of Mojo's on at least four occasions, and there's ample evidence for a reasonable jury to find in favor of the

willfulness.

Thank you, Your Honor.

THE COURT:  All right.  What's Defendants' position on this motion?

MR. KAMBER:  Your Honor, Defendants oppose and cross move for the following reasons:  For the '440 Patent from February of 2017, the evidence shows only that Samsung had pre-suit knowledge which is not enough to support a willfulness finding.  And with respect to the remaining patents asserted, those did not issue until 2021 and 2022, and there's no evidence that Samsung had any pre-suit knowledge of them prior to this suit.

THE COURT:  All right.  Thank you.

Let's turn next to the issue of damages.  Plaintiffs have moved for judgment as a matter of law that they're entitled to a reasonable royalty in the form of a running royalty I assume at the amount supported by their evidence of just over $303 million.

And Defendants have moved for judgment as a matter of law on damages basically that there should be no damages awarded specifically as to the '440 Patent, and then more generally based on a lack of apportionment as to all the patents-in-suit.

Let me hear from Plaintiff first, and then I'll hear from Defendants.

MR. SCOTT:  Good morning, Your Honor.  Kenneth Scott again for Plaintiff Mojo Mobility.

Your Honor, Plaintiff moves under Rule 50(a) on the issue of damages.  Plaintiff has met its burden of a preponderance of the evidence establishing that it is entitled to a reasonable royalty on each of the asserted patents.

The evidence presented by Doctors Ricketts, Reed-Arthurs, and Partovi as well as Mr. Bergman conclusively establishes that Mojo is entitled to a reasonable royalty on each of the asserted patents.

THE COURT:  All right.  What's the Defendants' posture on the damages issue?

MR. KAMBER:  Your Honor, we oppose and cross move with respect to -- I'll take these out of order.  With respect to the no damages argument from Defendants, there is not proper apportionment here, as we heard from the evidence.  The income approach that Mr. Bergman provided was not apportioned, as he admitted, and the market approach does not apportion, either.  And so because they failed to apportion to the features attributable to the claimed inventions, they are not entitled to damages.

With respect to the '440 Patent, Your Honor, I'll be a little bit more specific.  In testifying, Doctor Ricketts identified only the S9 through the S24 series phones with respect to the '440 Patent.  That's at trial transcript 432:11

1231

through 13.

Mojo's damages expert, Mr. Bergman, testified that he included the S6, S7, and S8 phones as part of his damages calculation, overall just about $40 million.  That's at the trial transcript at about pages 720 through 723.  And, therefore, Samsung is entitled to JMOL that no damages can be awarded for the S6 through S8 products.

THE COURT:  All right.  Anything further on the damages issue, Mr. Kamber?

MR. KAMBER:  No.  Thank you, Your Honor.

THE COURT:  All right.

Counsel, it appears that the Court has heard argument from the competing parties on each of the identified areas sought pursuant to Rule 50(a) for relief in the form of judgment as a matter of law.

The Court often reflects at this juncture that Rule 50(a) applies in the case where a party has been fully heard on an issue during a jury trial, and the Court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.  And in that case, the Court may, but is not required to, grant a motion for judgment as a matter of law on that issue.

Pursuant to the parameters of Rule 50(a) and the arguments presented on each of these matters, the Court denies the parties' competing motions on the issue of infringement

1232

and non-infringement.

The Court denies the parties' competing motions with regard to the issue of invalidity and validity as to the patents-in-suit.

The Court denies the parties' motions with regard to the issue of whether willfulness, if any, has been willful or not willful.

And the Court denies the competing motions from the parties with regard to the issue of damages and the award of a reasonable royalty, if any.

All matters presented under and pursuant to Rule 50(a), therefore, are denied by the Court.

Thank you for your presentations in this regard, counsel.

Having completed the review and consideration of motions under Rule 50(a), the Court is now prepared to hold an informal charge conference with counsel to review the most current draft and iteration of the proposed final jury instructions and verdict form.

We'll do this in my office in chambers.  I have about 12 minutes until 10:00 a.m.  If you will meet me at the door to chambers at 10:00 a.m., I'll bring you in, we will have a fulsome and free-flowing discussion about those matters, affording each side an opportunity to tell me why they have proposed some competing proposal to what the other side has proposed.

It will also give the Court an opportunity to query the parties about anything within their submissions, including areas where they may not be in disagreement but the Court has questions, and we'll have an off-the-record, free-flowing discussion of the totality of the proposed charge and verdict form, after which I'll take your input into account and I will then draft and prepare what I believe to be, in light of those discussions, the proper and appropriate final jury instruction and verdict form.

I'll supply those to you with an opportunity to review and consider them, and then I'll conduct on the record in the courtroom a formal charge conference where we will review those documents on a page-by-page basis and afford each side an opportunity to raise and lodge any objections to matters included or matters excluded that they feel the interests of their client requires.

So with that, if you'll meet me in approximately 10 or 11 minutes in chambers, we'll conduct the informal charge conference there and off the record at that time.

With that, the Court stands in recess.

(Recess.)

THE COURT:  Be seated, please.

All right, counsel.  I met with you earlier this morning, and we took up and considered motions under Rule 50(a) of the Federal Rules of Civil Procedure.  After I gave you the

1234

Court's ruling on those matters, I met with you off the record in chambers for an open and fulsome discussion of the final jury instructions and verdict form.

After that discussion and exchange of thoughts and comments, I took your input into account and have generated and presented to you what I believe to be the appropriate and proper final jury instructions and verdict form for this case. I've given you an ample opportunity to review it, and I'm prepared now to conduct a formal charge conference on the record where either party may lodge such objections as they think are warranted and necessary.

My usual practice in this regard is to ask each side to send a spokesperson to the podium, and those two spokespersons will remain there throughout the process.  I will begin with the final jury instructions, and I will address each page of those instructions, allowing either party to lodge any objections they wish to at any point along the way.  By doing this on a page-by-page basis consecutively through the documents, the Court believes there is a much smaller chance that any issue will be overlooked or inadvertently not considered.

So with that, whoever's going to speak for Mojo Mobility, please go to the podium.  Whoever's going to speak for the Samsung Defendants, please go to the podium.  And we'll begin with the final jury instructions.

1235

And just for the completeness of the record, if you two gentlemen would identify yourselves first.

MR. FOWLER:  Good afternoon, Your Honor.  Charles Fowler for Mojo Mobility.

MR. KAMBER:  Good afternoon, Your Honor.  Matthias Kamber for the Samsung Defendants.

THE COURT:  Thank you, counsel.

Let's begin with page 1 of the final jury instructions. Are there any objections here from either party?

MR. FOWLER:  None for Plaintiff, Your Honor.

MR. KAMBER:  None from Defendants, Your Honor.

THE COURT:  Turning then to page 2 of the final jury instructions, are there objections from either party here?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Turning then to page 3, are there any objections here?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Next is page 4.  Are there any objections here?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Next is page 5.  Are there any objections from either party?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Next is page 6.  Are there any objections?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Next is page 7.  Are there any objections here from either party?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Next is page 8.  Are there any objections here?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Next is page 9.  Are there any objections?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Next is page 10.  Are there any objections?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Turning then to page 11, are there any objections here?

MR. FOWLER:  None for Plaintiff.

1237

MR. KAMBER:  None for Defendants.

THE COURT:  Turning next to page 12, are there any objections?

MR. FOWLER:  None for plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Next is page 13.  Are there any objections?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

12:52   THE COURT:  Turning then to page 14, are there any objections here?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Next is page 15.  Are there any objections here?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Turning then to page 16 of the final jury instructions, are there any objections here from either party?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Next is page 17.  Are there any objections?

MR. FOWLER:  Yes, Your Honor, one objection for

Plaintiff.

THE COURT:  State your objection.

12:53   MR. FOWLER:  The objection is to the omission in the prior art instructions of an instruction that the effective filing date -- each claim is entitled to an effective filing date as of the earliest application for which the -- that discloses the invention, and then a listing of the priority dates for each of the patents which are undisputed.

12:53   THE COURT:  All right.  That objection is overruled. Is there anything from either party additionally on page 17?

MR. FOWLER:  Nothing else, Your Honor.

THE COURT:  Any objections from Defendants on page 17?

MR. KAMBER:  No, Your Honor.

THE COURT:  All right.  Then let's turn to page 18 of the final jury instructions.  Are there any objections here?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Next is page 19.  Are there any objections?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Next is page 20.  Are there any

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

objections?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Next is page 21.  Are there any objections?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Turning then to page 22.  Are there any objections?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Turning then to page 23.  Are there any objections?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  There is one objection on behalf of Defendants, Your Honor.

THE COURT:  All right.  State your objection.

MR. KAMBER:  The objection is, towards the bottom of the page, there is an instruction, it's the third to last sentence, and Defendants had requested that there be an instruction to the effect that the value of the patented feature must be apportioned from all of the unpatented features reflected in any relevant standard such that the patentee's royalty must be premised on the value of the patented feature, not any value added by that standard.

1240

THE COURT:  That objection is overruled.

12:55    Anything further on page 23?

MR. KAMBER:  No, Your Honor.

THE COURT:  All right.  Then we'll turn next to page 24, counsel.  Any objections here?

MR. FOWLER:  Nothing for Plaintiff.

MR. KAMBER:  Nothing for Defendants.

THE COURT:  Turning then to page 25, are there any objections here?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Counsel, you'll note that page 24 and 25 contain all 15 of the *Georgia-Pacific* factors.  I gather neither party objects to the Court charging this jury on all 15 factors.  Is that correct?

12:56    MR. FOWLER:  That's correct, Your Honor.  Plaintiff believes that the record supports all -- submitting all of them.

MR. KAMBER:  Defendants agree, Your Honor.

THE COURT:  All right.  Thank you.

Then let's turn to page 26 of the final jury instructions.  I'll ask if there in any objections here.

MR. FOWLER:  Yes, Your Honor.  Two objections to page 26 for Plaintiff.

THE COURT:  State your objections.

1241

MR. FOWLER: The first objection is to the third full paragraph, I think it's the second sentence, reads, "A party is not required to use or practice or have intended to use or practice patent rights in a license agreement for it to be a comparable license." Plaintiff objects to the inclusion of that instruction on the ground that it is unnecessary and confusing to the jury.

THE COURT: All right. That objection is overruled. State your next objection.

MR. FOWLER: Second, following the conclusion of that paragraph, Plaintiff objects to the omission of an instruction on non-infringing alternatives, summarized as follows: Plaintiff seeks an instruction that states for purposes of determining a reasonable royalty, you may consider whether there were acceptable non-infringing alternatives to taking a license, and then defining that as a product that has the advantages of the patented invention that were important to people who purchased the product, and then instructing the jury that they could make that comparison, Plaintiff believes that the record supports an instruction orienting the jury to the non-infringing alternatives issue.

THE COURT: All right. On this record the Court believes that's improper and overrules your objection.

Anything else on page 26?

MR. FOWLER: Not for the Plaintiff, Your Honor.

1242

THE COURT:  Anything on page 26 for Defendants?

MR. KAMBER:  No, Your Honor.

12:57    THE COURT:  Then let's turn to page 27 of the final jury instructions.  Are there any objections here from either party?

MR. FOWLER:  Nothing for the Plaintiff, Your Honor.

MR. KAMBER:  Nothing for Defendants.

THE COURT:  Next is page 28.  Are there any objections here?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  And next is the final page of the final jury instructions, page 29.  Are there objections here from either party?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  All right.  Thank you, counsel.

12:58    Let's turn next to the verdict form, which has been generated in the same process as the final jury instructions. We'll approach it in the same manner.

Beginning with the cover page or page 1 of the verdict form, are there objections here from either party?

MR. FOWLER:  No objections for Plaintiff.

MR. KAMBER:  No objections for Defendants.

THE COURT:  Turning to page 2 where various

definitions are included, is there any objection here from either party?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Turning to page 3 where certain instructions on proper completion of the verdict form are included, are there objections here from either party?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Turning then to page 4 where Questions 1A, 1B, and 1C are found, are there any objections here?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Turning to page 5 where Questions 1D and 1E and an instruction to the jury are found, is there any objection here?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Turning to the next page where Questions 2A, 2B, and 2C are found, are there any objections?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Turning to the next page where Questions 2D, 2E, and an additional instruction are found, is there any objection?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Turning to the next page where Question 3 is found, is there any objection?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  Turning to the next page where Questions 4A and 4B are found, are there any objections?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  And turning to the last and final page of the verdict form, are there any objections to the final page from either party?

MR. FOWLER:  None for Plaintiff.

MR. KAMBER:  None for Defendants.

THE COURT:  All right, counsel.  That completes the final charge conference.

I will need a few minutes to generate the requisite copies so that each member of the jury can have their own printed hard copy of the final jury instructions.  After I've done that, I will return to the courtroom and be prepared to bring in the jury and proceed to orally give them my final instructions on the law.

With that, the Court stands in recess.

(Brief recess.)

1245

THE COURT:  Be seated, please.

I'm about to bring in the jury and proceed to give them the Court's final instructions, after which we'll hear closing arguments from counsel for the competing parties.

Let me say this to everyone present, especially those in the gallery.  The Court considers its final instructions on the law and counsels' closing arguments as the most serious part of an inherently serious process.  Accordingly, I don't want any disruptions or anything that should -- that might distract the jury during my final instructions or counsels' closing arguments.

If you have an electronic device on your person, make 200 percent sure it is off or silent.  If you need to get up and leave the courtroom at any time during this, get up and leave now.  I don't want people coming and going, I don't want people whispering or talking, I don't want electronic devices sounding.  In short, I don't want anything that would distract the jury during this portion of the trial.

Counsel, are you prepared to go forward with the Court's instructions and your closing arguments?

MR. POLLINGER:  The Plaintiff is ready, Your Honor.

MR. UNIKEL:  Defendants are ready, Your Honor.

THE COURT:  Thank you.

Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

1246

THE COURT:  Welcome back, members of the jury. Please have a seat.

Ladies and gentlemen of the jury, you've now heard all the evidence in this case and I will now instruct you on the law that you must apply.

Each of you are going to have your own printed hard copy of these final jury instructions that I'm about to give you orally.  You'll have these available to you in the jury room during your deliberations and you can refer to them during those deliberations.  Consequently, unless you just want to, I would suggest you not take notes but focus on me and my delivery of these instructions to you orally.

As I previously told you, you, the jury, are the sole judges of the facts in this case.  Do not consider any statement that I have made over the course of the trial or make as a part of these instructions as an indication to you that I have any opinion about the facts in this case.

Now, you are about to hear closing arguments from the attorneys for the competing parties.  Statements and arguments of the attorneys are not evidence, and they are not, ladies and gentlemen, instructions on the law.  They are intended only to assist the jury in understanding the evidence and the parties' competing contentions.

A verdict form has been prepared for you, and you'll take this verdict form with you to the jury room.  And when you

1247

have reached a unanimous decision as to how to answer the questions in the verdict form, you will have your foreperson fill in those unanimous answers to those questions in the form, sign it, and date it on behalf of the jury, and then advise the Court Security Officer that the jury has reached a verdict.

Answer each question in the verdict form from the facts as you find them to be.  Do not decide who you think should win this case and then answer the questions to reach that result.  Again, ladies and gentlemen, your answers to those questions and your verdict must be unanimous.

Now, in determining whether any fact has been proven in this case, you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them, and you may consider the effect of all the exhibits admitted into evidence regardless of who may have produced or presented that exhibit.

Now, some of the testimony that you heard was translated from another language.  In consideration of a witness' testimony, it is not relevant whether his or her testimony was in English or translated from another language into English.  You, the jury, are the sole judges of the credibility of each and every witness and the weight and effect to give to all of the evidence in this case.

In deciding the facts in this case, you may have to

decide which testimony to believe and which testimony not to believe. You alone are to determine the questions of credibility or truthfulness of the witnesses and the weighing of the testimony of those witnesses, and in doing that, you may consider the witness' demeanor and manner as reflected from the witness stand.

You may also consider any feelings or interest that the witness may have in the outcome of the case and any bias or prejudice they may have, and you may consider the consistency or inconsistency of every witness' testimony, considered in the light of the circumstances.

Has the witness been contradicted by other evidence? Has he or she made statements at other times and in other places that are contrary to what they said on the witness stand? You must give the testimony of each witness the amount of credibility and weight that you believe it deserves.

You must keep in mind, however, ladies and gentlemen, that a simple mistake does not mean that a witness is intentionally not telling the truth. You must consider whether any misstatements are an intentional falsehood or a simple lapse in memory and what significance should be attached to that testimony.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness is sufficient to prove any facts, even if a greater number of witnesses may

Case 2:22-cv-00398-JRG-RSP   Document 314   Filed 10/01/24   Page 30 of 123 PageID #: 38739
1249

have testified to the contrary, if, after considering all the evidence, you believe that single witness.

As I've told you previously, the attorneys in this case are acting as advocates for their competing clients, and they have a duty to raise objections when they believe evidence is being offered that should not be admitted under the rules of the Court.

In that case, when the Court has sustained an objection to a question addressed to a witness, you must disregard the question entirely, and you may not draw any inference from its wording or speculate about what the witness would have said if the Court had allowed them to answer the question.  On the other hand, if the objection was overruled, then you're to treat the answer to the question and the question itself just as if no objection had been made like any other question and answer.

Now, at times during the trial it was necessary for the Court to talk with the lawyers here at the bench or outside of your hearing when you were not in the courtroom.  This happens during trials because there are things that arise that do not involve the jury.  You should not speculate or attempt to guess what was said during any discussions that took place outside of your presence.

Certain testimony has been presented to you during this trial in the form of what is called a deposition.  A

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

1250

deposition are the sworn, recorded answers to questions asked to a witness in advance of the trial.  If a witness cannot be present to testify in person in open court, then the witness' sworn testimony may be presented in the form of a deposition.

Now, before the trial began, the attorneys representing the competing parties in this case questioned these deposition witnesses, and they were under oath at that time.  A court reporter was present, and both the questions they were asked and the answers they gave were recorded and transcribed.

Deposition testimony, ladies and gentlemen, is entitled to the same consideration by you as testimony given by a witness in person from the witness stand in open court.  And you, accordingly, are to judge the credibility and importance of the deposition testimony to the best of your ability, just as if the witness had testified personally in front of you in open court.

Now, while you should consider only the evidence in this case, you should understand that you are permitted to draw such reasonable inferences from the testimony and the exhibits that you feel are justified in the light of common experience. Said another way, ladies and gentlemen, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in this case.

However, you should not base your decisions on any

evidence not presented by the parties during the trial in open court, including your own experiences with any of the accused products that are at issue in this case.

Now, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case. One is direct evidence, such as the testimony of an eyewitness. The other is indirect or circumstantial evidence--that is, the proof of a chain of circumstances that indicates the existence or non-existence of certain other facts. As a general rule, the law makes no distinction between direct evidence or circumstantial evidence, but simply requires that you, the jury, find the facts based on the evidence presented, both direct and circumstantial.

Now, the attorneys in this case have used certain slides and other visual aids during the trial, sometimes referred to as demonstrative exhibits, or simply demonstratives, and they've used these while presenting or examining their witnesses. Demonstrative exhibits are a picture or a model to describe something involved in the trial.

If your recollection should differ from the demonstratives presented, then you should rely on your recollection. A demonstrative is not evidence, but the witness' testimony during which the demonstrative was used is evidence.

Now, when knowledge of a technical subject might be

1252

helpful to the jury, a person who has special training and experience in that technical field, we call them an expert witness, is permitted to state his or her opinions on those technical matters.  However, you're not required to accept those opinions.  As with any other witness, it is solely up to you to decide who to believe and who you do not believe, and whether or not you want to rely or give any weight to the testimony presented.

Now, a patent holder has the right to file a suit in a United States District Court and has the right to a trial by jury if that patent holder believes its patent rights are being infringed.  However, you should make no inference from the fact that a suit was filed or brought to trial.  You're to consider this suit as a dispute between two parties of equal worth and equal standing in the community, and you are to render your verdict based solely on the evidence presented during the trial.

Now, the Plaintiff Mojo has the burden of proving patent infringement by a preponderance of the evidence.  Mojo also has the burden of proving willful patent infringement by a preponderance of the evidence, and Mojo has the burden of proving damages for any patent infringement by a preponderance of the evidence.

A preponderance of the evidence means evidence that persuades you that a claim is more probably true than not

true.  Sometimes this is talked about and discussed as being the greater weight and degree of credible testimony.

Now, the Samsung Defendants have the burden of proving patent invalidity by clear and convincing evidence.  Clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the party's factual contentions are highly probable.

Although proof to an absolute certainty is not required, ladies and gentlemen, the clear and convincing evidence standard requires a greater degree of persuasion than is necessary for the preponderance of the evidence standard.  If the proof presents -- or establishes in your mind an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been met.

Now, these two burdens of proof are not to be confused with a separate and a different burden of proof known as beyond a reasonable doubt, which is the burden of proof applied in a criminal case.  This is not a civil [sic] case and that burden of proof has no application in this case whatsoever.  Clear and convincing evidence is a lower standard than beyond a reasonable doubt, but it is a higher standard than the preponderance of the evidence.

Now, in determining whether any fact has been proved by a preponderance of the evidence or by clear and convincing evidence, you may, unless otherwise instructed, consider any

stipulations or agreements between the parties, the testimony of all the witnesses regardless of who called them, and all exhibits presented and received into evidence during the trial regardless of who may have produced or presented them.

Now, as I did at the beginning of the case, I'll give you a summary of each side's contentions, and then I'll provide you with detailed instructions on what each side must prove in order to win on each of its contentions.

As I've previously told you, this case concerns five separate United States patents asserted by the Plaintiff Mojo. These patents are United States Patent No. 9,577,440, U.S. Patent No. 11,201,500, U.S. Patent No. 11,316,371, U.S. Patent No. 11,462,942, and U.S. Patent No. 11,342,777.  And you've previously heard these referred to during the trial as the '440 Patent, the '500 Patent, the '371 Patent, the '942 Patent, and the '777 Patent, which I think somebody called the triple 7 patent during the trial.

I will refer to these collectively as the patents-in-suit, and I may also refer to them collectively as the asserted patents.

Now, the Plaintiff Mojo seeks money damages from the Defendants, the Samsung parties, for allegedly infringing the patents-in-suit by making, using, importing, selling, or offering to sell in the United States various smartphones, earbuds, wearables, and chargers with wireless charging

functionality.  Sometimes in these instructions I'll refer to these as the Samsung accused products.

Mojo contends that the accused products infringe the following claims of the patents-in-suit:  Claim 1 of the '440 Patent, claims 23 and 30 of the '500 Patent, claims 28 and 30 of the '371 Patent, claims 1 and 21 of the '942 Patent, and claim 15 of the '777 Patent.

As I've told you, these claims are sometimes referred to as the asserted claims, and Mojo alleges that the accused products literally infringe the asserted claims.  Mojo also alleges that the Samsung Defendants' infringement is and has been willful, and Mojo seeks money damages in the form of a reasonable royalty.

Now, the Samsung defendants deny that the accused products infringe any of the asserted claims of the patents-in-suit.

Samsung further denies Mojo's allegation that it willfully infringed any of the asserted claims.

And Samsung denies that it owes Mojo any damages in this case.

Samsung further contends that the asserted claims of the '440, the '500, the '371, the '942, and the '777 Patents, the patents-in-suit, are invalid because they are obvious.

Invalidity, ladies and gentlemen, is a defense to infringement.  Invalidity and infringement, however, are

separate and distinct issues.  Your job is to decide whether Samsung has infringed any of the asserted claims from the patents-in-suit, and if so, whether or not those claims are invalid.

If you decide that any claim has been infringed and is not invalid, then you will need to decide whether Samsung's infringement has been willful and you will need to decide the amount of money damages, if any, to be awarded to Mojo to compensate it for that infringement that you have found.

If you decide that there was any infringement of the asserted patents and that such infringement was willful, your decision on willfulness should not affect any damages that you might award.  If you find that any infringement was willful, the Court will take that finding of willfulness into account later.

Now, several times in these instructions I will refer to a person of ordinary skill in the field of the invention, sometimes called a person of ordinary skill in the art.  It's up to you to decide the level of ordinary skill in the field of the invention.

In deciding what the level of ordinary skill is, you should consider all the evidence introduced at trial including but not limited to:

1.  The levels of education and experience of the inventors and other persons actively working in the field;

1257

2.  The types of problems encountered in the field;

3.  The prior art solutions to those problems;

4.  The rapidity with which innovations are made; and

5.  The sophistication of the technology.

A person of ordinary skill in the art, ladies and gentlemen, is a hypothetical person who is presumed to be aware of all the relevant prior art at the time of the claimed invention.

Now, before you can decide many of the issues in this case, you'll need to understand the role of the patent claims.

The claims of a patent are those numbered sentences found at the end of the patent. The claims define the patent holder's rights under the law. The claims are important, because it is the words of the claims themselves that define what the patent covers. The figures and the text in the rest of the patent provide a description or examples of the invention, but they -- and they provide a context for the claims, but it is the claims themselves that define the breadth of the patent's coverage.

Each claim is effectively treated as if it were its own separate patent, and each claim may cover more or may cover less than any other claim. Therefore, what a patent covers depends upon what each of its claims covers.

Now, you first need to understand what each claim covers in order to decide whether or not there is infringement of

that claim and to decide whether or not the claim is invalid. And the first step is to understand the meaning of the words used in the patent claims.

Now, the law says that it's my role as the judge to define the terms of the claims, but it's your role as the jury to apply my definitions to the issues that you are asked to decide.

As I've explained to you at the beginning of the case, I have already determined the meanings of certain language from the asserted claims, and I have provided these definitions to you in your jury notebooks.  And I incorporate those definitions by reference into these final jury instructions.

You must accept, ladies and gentlemen, my definitions of these words and language from the claims as being correct, and it is your job to take these definitions, sometimes called constructions, that the Court has reached and supplied to you and apply them to the issues that you are asked to decide, including the issues of infringement and the issues of invalidity.

Now, you should disregard any evidence presented at the trial that contradicts or is inconsistent with these constructions and definitions that the Court has given you. And, again, these are in your notebooks and available to you there to reflect and consider during your deliberations.

Now, for claim limitations or language that the Court has

1259

not construed--language within the limitations or elements of the claims that I have not interpreted--you are to use and apply the plain and ordinary meaning of that term or that language as understood by one of ordinary skill in the art; that is to say, in the field of the technology of the patent at the time the alleged -- of the alleged invention and in light of the specification.

Now, the meaning of the words from the patent claims must be the same when deciding any issue, including the issues of infringement and the issues of invalidity.

Now, you have also been provided in your juror notebooks with separate copies of each of the five asserted patents. These are in your notebooks and you may refer to them and consider them during your deliberations.

I'll now explain to you how a claim defines what it covers. A claim sets forth in words a set of requirements, and each claim sets forth its requirements in a single sentence. If a device or a system satisfies each of the requirements in that sentence, then it infringes that claim.

There can be several claims in a patent. A claim may be narrower or broader than another claim by setting forth more or fewer requirements. The coverage of a patent is assessed and determined on a claim-by-claim basis.

In patent law the requirements of a claim are often referred to as the claim elements or as the claim limitations.

1260

When a product meets all of the requirements of a claim, that claim is said to cover that product, and that product is said to fall within the scope of that claim.  In other words, a claim covers a product where each and every of the claim elements or limitations are present in that product.

If a product is missing even one element or limitation of a claim, then the product is not covered by the claim.  And if the product is not covered by the claim, the product does not infringe the claim.

Now, this case involves two types of patent claims--independent claims and dependent claims.  An independent claim does not refer to any other claim in the patent--it is independent.  An independent claim sets forth all the requirements that must be met in order to be covered by the claim.  Therefore, it's not necessary to look at any other claim within the patent to determine what an independent claim covers.

On the other hand, a dependent claim does not by itself recite all the requirements of the claim, but refers to another claim or claims for some of its requirements.  In this way, the dependent claim refers to or depends on these other claim or claims.

A dependent claim incorporates all the requirements of the claim to which it refers or from which it depends, as well as the additional requirements set forth within the dependent

claim itself.  So to determine what a dependent claim covers, it's necessary to look at both the dependent claim and any other claim or claims to which it refers or as we often say, from which it depends.  A product that meets all the requirements of both the dependent claim and the claim or claims to which it refers is covered by that dependent claim.

Now, taking the '500 Patent as an example, claim 23 is an independent claim.  Claim 30 of the '500 Patent is a dependent claim that refers back to or depends from independent claim 23.  Therefore, dependent claim 30 includes all the requirements of claim 23 as well as its own requirements within claim 30.

Now, for each of the asserted claims in this case, their independence and dependence are as follows:

For claim '440, claim 1 is an independent claim.

For Patent '500, claim 23 is an independent claim and claim 30 is a dependent claim that depends from claim 23.

For the '371 Patent, claims 28 and claims 30 are independent claims.

For the '942 Patent, claim 1 and claim 21 are independent claims; and

For the '777 Patent, claim 15 is an independent claim.

Now, the claims of the patents-in-suit use the word 'comprising'.  Comprising means including but not limited to or containing but not limited to.  Now, when comprising is

used in the preamble of a claim, if you decide that an accused product includes all the requirements of the claim, the claim is infringed.  And this is true even if the accused product contains additional elements.

For example, if you take a claim that covers the invention of a table, if the claim recites a table comprising a tabletop, four legs, and glue that holds the legs and the tabletop together, then the claim will cover any table that contains these structures, even if the table contains other structures or features, such as leaves that would expand the size of the tabletop or wheels that would go on the ends of the legs.

Now that's a simple example regarding the word 'comprising' and what it means.  In other words, ladies and gentlemen, a product can have other features in addition to those that are covered by the patent.

Now, on the other hand, using the same simple example, if a claim recites a table comprising a tabletop, four legs, and glue, it will not cover a table that has only three legs, even if it still has a tabletop and glue.  In other words, if a single feature recited in the claim is missing, a product is not covered by that claim.

I'll now instruct you on infringement in more detail.  If a person makes, uses, sells, or offers for sale within the United States, or imports into the United States what is

covered by a patent claim without the patent owner's permission, that person is said to infringe the patent.

To determine whether there is infringement, you must first compare the asserted patent claims, as I might have defined them for you, to the accused products.  You should not compare the accused products with any specific example set out in the patent or with the prior art in reaching your decision on infringement.

In deciding infringement, ladies and gentlemen, the only correct comparison is between the accused products and the limitations or elements of the asserted claims and where the Court has interpreted or construed some of the language in those claims applying the Court's constructions.

Now, you must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by both of the parties.

I'll now instruct you on the specific rules that you must follow to determine whether the Plaintiff Mojo has proven that the Samsung Defendants infringe one or more of the patent claims involved in this case by a preponderance of the evidence.

A patent can be directly infringed even if the alleged infringer did not know of the patent and without the direct infringer knowing that what it did was infringement of a

1264

claim. A patent may also be directly infringed even though the accused direct infringer believed in good faith that what it did was not infringement of the patent. Infringement does not require proof that a party copied its product from the asserted claims.

Now, in this case the Plaintiff Mojo contends that the Samsung Defendants directly infringe all of the asserted claims by literal infringement. In order to prove direct infringement by literal infringement, Mojo the Plaintiff must prove by a preponderance of the evidence, that is, that it's more likely than not, that Samsung made, used, sold, offered for sale within, or imported into the United States a product that meets all of the requirements of a claim, and did so without the permission of Mojo during the time an asserted patent was in force. You must compare the product with each and every one of the requirements of the claim to determine whether all the requirements of the claim are met.

A claim element or limitation is literally present if it exists in the accused product as it is described in the claim language, either as I have defined that language for you, or if I did not define it, according to its plain and ordinary meaning as understood by one of ordinary skill in the art.

If any element recited in a claim is not found in an accused product, then you must find that particular product does not infringe that claim. So long as an accused product

has each and every one of the claim limitations, then infringement of that claim is shown even if the product contains additional elements that are not required by the claim.

Now, you must decide separately and for each asserted claim whether or not there is infringement.  However, if you find that an independent claim on which other claims depend is not infringed, then there cannot be infringement of any dependent claim that depends on that independent claim.

But if you find that an independent claim has been infringed, you must still decide separately whether the accused product meets the additional requirements of any asserted claim that depends from or refers to that independent claim--that is, a dependent claim--in order to determine whether that dependent claim has also infringed.

Now, as I've said, a dependent claim includes all of the requirements of any of the claims to which it refers or from which it depends, plus the additional requirements set forth within the dependent claim itself.

Now, the phrase "a means for avoiding overcharging one or both of the mobile device and battery inductively" in claim 1 of the '440 Patent is a so-called means-plus-function claim limitation.

Means-plus-function claims have a special meaning in patent law.  The means-plus-function claim limitation does not

cover all the structures that could perform the functions set forth in the claim.  Instead, it covers a structure or set of structures that performs the function and that is either identical or equivalent to the structures described in the patent for performing the function.

To demonstrate that these limitations are literally met, Mojo must prove by a preponderance of the evidence (that is, that it's more likely than not) that the accused products contain a structure that (1) performs the recited function; and (2) is identical or equivalent to the structure that is disclosed in the patent specification and drawings for performing the recited function.

Now, I've set forth in my claim construction determinations both the recited function that is to be performed by the structure and the structure that is to be disclosed in the patent specification that performs the recited function.  These constructions are also contained in your juror notebooks, and you may refer to them.

Now, whether the structure of the accused product is equivalent to a structure disclosed in the patent specification and drawings is decided from the perspective of a person of ordinary skill in the art.  The structure in the accused product and that disclosed in the patent are equivalent if a person of ordinary skill in the art would consider the differences between them to be insubstantial.

1267

One way to show this is to demonstrate that the structure in the accused product performs the identical function in substantially the same way to achieve substantially the same result as would be achieved by the element that is disclosed in the patent specification.

Now, in deciding whether the differences would be insubstantial, you may consider whether people of ordinary skill in the art would have known that the accused structure and the structure identified in the claim construction were interchangeable at the time the patent issued.

The Plaintiff Mojo contends that the Samsung Defendants willfully infringed the patent claims -- the asserted claims, I should say.  If you decide that Samsung has infringed any valid claim of the asserted patents, you must go on and separately address the additional issue of whether or not that infringement was willful.  Mojo, the Plaintiff, has the burden of proving willful infringement by a preponderance of the evidence.

You may not determine that infringement was willful just because Samsung knew of the asserted patents and infringed them.  You may find that Samsung willfully infringed if you find that Samsung deliberately or intentionally infringed the asserted patents.  You may also find that Samsung's actions were willful if Samsung acted in reckless or callous disregard of, or with indifference to, the rights of Mojo.

A defendant is indifferent to the rights of another when it proceeds in disregard of a high or excessive danger of infringement that is known to it or was apparent to a reasonable person in its position.

To determine whether Samsung acted willfully, consider all the facts and assess Samsung's knowledge at the time of the challenged conduct.  Facts that may be considered include but are not limited to the following:

1.  Whether or not Samsung acted consistently with the standards of behavior for its industry;

2.  Whether or not Samsung intentionally copied a product of Mojo that is covered by the asserted patents;

3.  Whether or not Samsung reasonably believed that it did not infringe or that the asserted patents were invalid;

4.  Whether or not Samsung made a good-faith effort to avoid infringing the asserted patents; for example, whether Samsung attempted to design around the asserted patents; and

5.  Whether or not Samsung tried to cover up its infringement.

Now, Mojo must show that Samsung knew of the specific patents asserted in this case and willfully infringed the asserted claims in those patents.  You may also find that Samsung's actions were deliberate or intentional if Samsung was willfully blind to Mojo's patent rights.  Willful blindness is established if Samsung believed there was a high

1269

probability that the acts, if taken, would constitute infringement of the asserted claims, but deliberately avoided confirming that belief.

Your determination as to willfulness should incorporate the totality of the circumstances based on all the evidence presented during the trial. Willfulness can be established by circumstantial evidence. If you decide that any infringement was willful, that decision should not affect any damages that you might award. The Court, as I've told you, will take willfulness into account later.

I'll now instruct you on the rules that you must follow in deciding whether or not Samsung has proven by clear and convincing evidence that the asserted claims of the patents-in-suit are invalid. Patent invalidity, ladies and gentlemen, is a defense to patent infringement. Invalidity and infringement are separate and distinct issues that must be separately decided by you, the jury.

An issued United States patent is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office, which you've heard referred to throughout the trial as either the PTO or the Patent Office, acted correctly in issuing the patent. However, there is the possibility that mistakes were made at the PTO. Therefore, the presumption of validity can be overcome if clear and convincing evidence established -- if clear and convincing

evidence is presented in court that a claim is invalid. Therefore, you, the jury, must determine whether Samsung has proved that Mojo's claims are invalid.

Like infringement, invalidity is determined on a claim-by-claim basis. You must determine separately for each claim whether that claim is invalid. If one claim of a patent is invalid, this does not necessarily mean that any other claim is invalid.

Claims are construed in the same way for determining infringement as for determining invalidity, and you must apply the claim language consistently and in the same manner for the issues of infringement and for the issues of invalidity.

Now, at times you'll hear me make references to prior art. A previous device, system, method, publication, or patent that predates the patent's effective date or the effective filing date is generally called prior art.

Prior art may include items that were publicly known or that had been used or offered for sale, or references, such as publications or patents, that disclose the claimed invention or elements of the claimed invention. Prior art also includes the general knowledge or use of an invention by a person of ordinary skill in the art in the United States at the time of the invention.

In evaluating the prior art to determine whether invalidity has been proven by clear and convincing evidence,

you may consider whether that prior art was or was not before the Patent Office.

In deciding validity, the only correct comparison is between the prior art and the limitations of the asserted claims. It is improper to compare the prior art to the accused product.

Now, Samsung contends that the asserted claims of the '440, the '500, the '371, the '942, and the '777 Patents are invalid as being obvious. I'll now instruct you on how to determine whether any of the asserted claims are invalid as being obvious.

Even though an invention, ladies and gentlemen, may not have been identically disclosed or identically described in a single prior art reference before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of the technology of the patent at the time the invention was made.

Samsung has the burden of establishing obviousness by showing by clear and convincing evidence that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the inventions were made in the field of wireless charging.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field that someone would have had at the time the invention was

made, the scope and content of the prior art, and any differences between the prior art and the claimed invention.

The existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness.  Most, if not all, inventions rely on the building blocks of prior art.  The skill of the actual inventor is not necessarily relevant because inventors may possess something that distinguishes them from persons having ordinary skill in the art.

Now, in considering whether the claimed invention was obvious, you must first determine the scope and content of the prior art as a whole, the differences between the prior art and the claimed invention, and the level of ordinary skill in the art.  The scope and content of the prior art for deciding whether the invention was obvious includes at least prior art in the same field as the claimed invention.  It also includes prior art from different fields that a person of ordinary skill in the art would have considered when trying to solve the problem that is addressed by the invention.

Teachings, suggestions, and motivations may also be found within the knowledge of a person of ordinary skill in the art, including inferences and creative steps that a person of ordinary skill in the art would employ.  A person of ordinary skill may be able to fit the teachings of multiple pieces of prior art together, like the pieces of a puzzle.  The person

of ordinary skill in the art would have the capability of understanding the scientific and engineering principles applicable to the pertinent art.

In considering whether a claimed invention is obvious, you may but you are not required to find obviousness if, at the time the invention was made, there was a reason that would have prompted a person having ordinary skill in the field to combine the known elements in a way the claimed invention does, accounting for such factors as follows:

1.  Whether the claimed invention was merely the predictable result of using prior art elements according to their known function;

2.  Whether the claimed invention provided an obvious solution to a known problem in the relevant field;

3.  Whether the prior art teaches or suggests the desirability of combining elements in the claimed invention;

4.  Whether the prior art teaches away from combining elements in the claimed invention;

5.  Whether it would have been obvious to try the combination of elements in the claimed invention, like when there is a design need or market pressure to solve a problem, and there are a finite number of identified, predictable solutions; and

6.  Whether the change resulted more from the design, incentives, or other market forces.

To find the invention obvious, you must find that the prior art provided a person having ordinary skill in the field a reasonable expectation of success in combining the teachings of the prior art to result in the claimed invention.  Obvious to try is not sufficient in unpredictable technologies.

In support of obviousness, you may also consider whether others independently invented the claimed invention at roughly the same time as the date of the invention.  In making these determinations, a person of ordinary skill uses simple common sense and can rely upon the inferences and creative steps that a person of ordinary skill in the art would employ.

Also, Samsung does not need to show that one of ordinary skill would actually have combined the physical structures of two references.  It need only be obvious to combine the teachings.  In determining whether the claimed invention was obvious, consider each claim separately.  Do not use hindsight; consider only what was known at the time of the invention.  In other words, you should not consider what a person of ordinary skill in the art would know now or what has been learned from the teachings of the asserted patent.

In making these assessments, you should account for any objective evidence, sometimes called secondary considerations, that may have existed at the time of the invention and afterward, and that may shed light on the obviousness or not of the claimed invention.  The following are possible

1275

secondary considerations, but it's up to you to decide whether secondary considerations of non-obviousness exist at all. These are as follows:

1.  Whether the invention was commercially successful as the result of the merits of the claimed inventions, rather than the result of design needs or market pressure, advertising, or similar activities;

2.  Whether the invention satisfied a long-felt need;

3.  Whether the inventor proceeded contrary to accepted wisdom in the field;

4.  Whether others tried but failed to solve the problem solved by the claimed invention;

5.  Whether others invented the invention at roughly the same time;

6.  Whether others copied the claimed invention;

7.  Whether others accepted licenses under the patents-in-suit because of the merits of the claimed invention;

8.  Whether the claimed invention achieved unexpected results;

9.  Whether others in the field praised the claimed invention;

10.  Whether there were changes or related technologies or market needs contemporaneous with the invention; and

11.  Whether persons having ordinary skill in the art at

the time of the invention expressed surprise or disbelief regarding the invention.

For commercial success or any other secondary consideration to be evidence of non-obviousness, there must be a connection or a nexus between the factors and the patented features of the invention.  Mojo has the burden of establishing this connection or nexus.

Moreover, even if you conclude that some of the above indicators of objective evidence have been established, those factors should be considered along with all the other evidence in this case in determining whether Samsung has proven that the claimed invention would have been obvious.

Now, if you find that Samsung's products infringed any valid claim of the asserted patents, you must then consider what amount of damages, if any, to award to Mojo for that infringement.

I'll now instruct you about the measure of damages.  But by instructing you on damages, ladies and gentlemen, I am not suggesting which party should win this case on any issue.  If you do not find that Samsung infringes a patent or if you find that a patent is invalid, then you will not consider damages for that patent.

If you award damages, they must be adequate to compensate Mojo for any infringement.  You must not award Mojo more damages than are adequate to compensate it for the

infringement you have found.  You also must not include any additional amount for the purposes of punishing Samsung or setting an example.

Mojo in this case has the burden to establish the amount of its damages by a preponderance of the evidence.  Now, the patent laws specifically provide that damages for infringement may not be less than a reasonable royalty.  The Plaintiff Mojo must prove the amount of its damages with reasonable certainty, but need not prove the amount of its damages with mathematical precision.  You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.

Mojo seeks damages in the form of a reasonable royalty.  A royalty, ladies and gentlemen, is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty is the amount of a royalty payment that a patent owner and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when infringement first began.  You must consider this date for each asserted patent.

Now, you may have heard references throughout the trial as to whether Mojo should be entitled to a running royalty or a lump sum royalty.  If you find that Mojo is entitled to damages, you must decide whether the parties would have agreed to a running royalty or a fully paid-up lump sum royalty at

the time of the hypothetical negotiation.

A running royalty is a fee paid for the right to use the patent that is paid for each unit of the infringing products that have been sold or will be sold in the future.  If there are additional units sold in the future, any damages for these sales will be addressed by the Court and will not be addressed by you.

If you decide that a running royalty is appropriate, then the damages that you award, if any, should reflect the total amount necessary to compensate Mojo for Samsung's past infringement, and the Court will address future compensation to Mojo as to future sales.

By contrast, a lump sum royalty is when the infringer pays a single one-time price for a license covering both past and future infringing sales for the life of the patent.  If you decide that a lump sum royalty is appropriate, then the damages you award, if any, should reflect the total amount necessary to compensate Mojo for Samsung's past and future infringement.

In considering this hypothetical negotiation, you should focus on what the expectations of Mojo and Samsung would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations.  You must assume that both parties believed the asserted claims were valid and infringed, and that both parties were willing to enter into an

agreement.

The reasonable royalty that you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty that either party would have preferred.  In the context of the hypothetical negotiation, it is not necessarily the case that each valid and infringed patent in the hypothetical negotiation contributes equally to the amount that Samsung would pay for a license, or that each patent covered by other licenses that were presented contributes equally to the amount that was paid for those licenses.

Now, the law requires that any damages awarded to the Plaintiff correspond to the value of the alleged inventions within the accused products, as distinct from other unpatented features of the accused product, or other factors such as marketing or advertising or size or market position.  This is particularly true where the accused product has multiple features and multiple components not covered by the patent, or where the accused product works in conjunction with other non-patented items.

Therefore, the amount you find as damages must be based on the value attributable to the patented technology.  If the unpatented features contribute to an accused product, you must apportion the value to exclude any value attributable to unpatented features.  You must determine an appropriate

1280

royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone.  The Plaintiff Mojo bears the burden to establish the amounts attributable to the patented features.

In determining the reasonable royalty, you should consider all facts known and available to the parties at the time infringement began.  Some kinds of factors that you may consider in making your determinations are:

1.  The royalties received by the patentee for the licensing of the patents-in-suit, proving or tending to prove an established royalty.

2.  The rates paid by the licensee for the use of other patents comparable to the patents-in-suit.

3.  The nature and scope of the license as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4.  The licensor's established policy and marketing program to maintain its patent monopoly or by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5.  The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.

6.  The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as generator of the sales of his non-patented items, and the extent of such derivative or convoyed sales.

7.  The duration of the patent and the term of the license.

8.  The established profitability of the product made under the patent, its commercial success, and its current popularity.

9.  The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10.  The nature of the patented invention, the character of its commercial embodiment as owned and produced by the licensor, and the benefits to those who have used the invention.

11.  The extent to which the infringer has made use of the invention and any evidence probative of the value of that use.

12.  The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.  The portion of the realizable profit that should be

credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14.  The opinion testimony of qualified experts.

15.  The amount that a licensor (such as Mojo) and a licensee (such as Samsung) would have agreed upon at the time the infringement began, if both had been reasonably and voluntarily trying to reach an agreement--that is, the amount that a prudent licensee who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention, would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one of these factors is dispositive, ladies and gentlemen, and you should consider the evidence that has been presented to you in this case on each of these factors.  You may have heard these 15 factors referred to during the trial as the *Georgia-Pacific* factors.

You may also consider other factors which, in your minds, would have increased or deceased the royalty Samsung would have been willing to pay and the patent owner Mojo would have been willing to accept with both acting as normally prudent business people.

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for the rights to the patent in question or for rights to similar technologies.  Comparable license agreements are one factor that may inform your decision as to the proper amount and form of the reasonable royalty award, similar to the way in which the value of a house is determined relative to comparable houses sold in the same neighborhood.

Such licenses may indicate the patented invention's economic value in the marketplace, and they may indicate the proper form of the royalty structure, such as a lump sum or as a running royalty.  A party is not required to use or practice, or have intended to use or practice, patent rights in a license agreement for it to be a comparable license agreement.

A license agreement may not -- need not be perfectly comparable to a hypothetical license that would have been negotiated between the patent owner and the alleged infringer in order for you to consider it.  However, if you choose to rely on any evidence from any other license agreements, you must account for any differences between those licenses and the hypothetically negotiated license in terms of the technologies and economic circumstances of the contracting parties, when you make your reasonable royalty determination.

Now, in considering the evidence of a reasonable royalty,

1284

you are not required to accept one specific figure or another for the reasonable royalty. You are entitled to determine what you consider to be a reasonable royalty based upon your consideration of all the evidence presented by the parties, whether that evidence is of a specific figure or a range of figures.

Now, in calculating damages, you may only award damages to Mojo for infringement that has occurred after the damages period begins. The damages period for the issues related to infringement of the asserted patents in this case are as follows:

With regard to the '440 Patent, the damage period begins on February the 21st, 2017.

With regard to the '500 Patent, the damages period begins on December the 14th, 2021.

With regard to the '371 Patent, the damages period begins on April the 26th, 2022.

With regard to the '942 Patent, the damages period begins on October the 4th, 2022.

With regard to the '777 Patent, the damages period begins on May the 24th, 2022.

Now, with these instructions, ladies and gentlemen, we are ready to hear closing arguments for the attorneys in this case.

The Plaintiff may now present its first closing argument

to the jury.  Would you like a warning on your time?

MS. TRUELOVE:  I would, Your Honor.  If you could please let me know when I've used eight minutes and also when there's been 20 minutes used in our opening.

THE COURT:  I'll warn you when you've used 8 minutes and when you've used 20 minutes.

MS. TRUELOVE:  May I have permission to bring this table just to the side of the podium?

THE COURT:  You may.

MS. TRUELOVE:  Thank you.

THE COURT:  You may proceed with Plaintiff's first closing argument.

MS. TRUELOVE:  Thank you very much, Your Honor.  May it please the Court, counsel.

Ladies and gentlemen of the jury, I want to begin, first of all, by thanking you.  You know, as you heard in the preliminary instructions from this Court, everyone here recognizes that this is a service.  We've watched you and we've seen you taking notes, you've paid attention, you get here before the courthouse doors open and we know you're there and you're working hard for very long days.  And on behalf of myself, our trial team, Doctor Partovi, and I feel certain Samsung's trial team and Samsung, we do appreciate your service.

And before I really get into the detail, I want to just

remind you, too, that when you go back there to deliberate and you close that door, you don't have to leave your common sense on the outside.  You get to take it with you.  And that means you get to ask why.  You should be asking why as you're evaluating the evidence in this case.

And so why are we here?  We're here because Samsung wants something for nothing.  And you alone are the judges of the credibility of the witnesses and the testimony that you heard in this case.

And so what did we hear?  What did we hear from Samsung's witnesses?  They brought you four fact witnesses.  And don't be confused:  These are not experts on patents.  These were not providing you infringement analysis.  These witnesses were not here to talk to you about the validity of the patents or damages.

And so what did they tell you?  Well, you first heard from Mr. Repice, by all accounts, a lovely man.  What is his role in this trial?  He is Samsung's corporate rep.  He is here to speak for Samsung.  And what did he tell you?  Well, first of all, he didn't dispute anything on Doctor Partovi's timeline, didn't come here to tell you that none of that stuff happened.  The meetings happened, the trips to Korea, it all happened.

He didn't dispute the correspondence, the emails.  He didn't say that, hey, we weren't reaching out to him and

1287

asking to see patents; we weren't reaching out to him to say, hey, can you help us find the solution. Didn't say any of that.

But what did he come here and say? What did Samsung have him come here and say? Wireless charging is not a key innovator. It's not a key driver. Really?

We heard from Mr. Lee. Mr. Lee said his whole career at Samsung basically, 17 years, 45,000 hours, has been spent working on the development of wireless charging.

A crack team that started late in the year 2000, took them 11 years to get a product on the market.

Mr. Choi came here. He said, I'm a master, one of 30 of those in the whole company of Samsung. And what did they have him working on? Wireless charging.

Ask yourself why. Why would they have Mr. Repice come in here and tell you that wireless is not a key driver? Because Samsung wants something for nothing. Just think about the commercial that you saw. Would they be spending that money on something that's not a driver?

And what did he say when asked at the end on behalf of Samsung when Mr. Pollinger asked him, So you're just going to take it out of there? You're just going to take the wireless out of your products? Probably unlikely.

Now, let's talk about the credibility of the technical experts in this case. You heard from Professor Ricketts, and

you heard from him for a really long time, I think probably over four hours.  But he had a big job to do.  He told you he spent 400 hours analyzing evidence, and they were very, very precise and talking to you about the types of evidence that they brought.  They brought you schematics, and they brought you approval sheets and data sheets and test data.  You know, everything that he talked to you about.  And he went through in great detail element-by-element.  And I know it was long.

But that's how you prove up use by Samsung of these patents.  And the Judge just went over the burden of proof to you, and I want to use a little example.  I mean, all things being equal, our burden of proof for infringement is by a preponderance of the evidence.  If you think of a ream of paper, that's just putting one more piece of paper on that scale.  That's it for infringement.

Now, what did we hear from Doctor Zane?  Again, by all accounts, intelligent, lovely person.  But what did he tell you?  And I don't know if you picked up on what Dr. Burgess was trying to get across.  Right?  But he's telling you that now two reports, one of the reports on validity, 781-page report, took him 40 hours?

And when Dr. Burgess pressed him on that, you know, at the end of the day he wasn't doing the work on that report by himself.  Samsung was helping him do it and he told you that.

And why is that important?  Not trying to demean Doctor

1289

Zane by any account; just trying to get the whole picture here.  Right?  What Samsung is trying to say is that Doctor Partovi, his patents were obvious.  And what did we talk about in voir dire?  There is a presumption of validity, a presumption.  And so in order for Samsung then to come back and overturn that presumption, they have a bigger burden of proof.  They have to do clear and convincing.

Now, it's not a whole ream of paper.  Right?  That would be beyond a reasonable doubt, but it's a significant amount.  In order to -- and think about this.  Samsung isn't just saying that the PTO got it wrong one time or two times.  Samsung is saying that the Patent Trademark Office got it wrong eight different times.  And one of those patents cited to two of the pieces of prior art that they're talking to you about.

And I think it's real interesting that, you know, you're going to see this--I feel certain--you're going to see that slide again with all the big companies out there that are working on wireless, they'll talk to you about how way back to Tesla, however many hundreds of years that was, and outlined with the prior art, if it was so obvious, where is the Apple patent?  Where is the Samsung patent?  If it was so obvious, where is it?  Ask yourself why, why are we going down this path?  Because Samsung wants something for nothing.

Mr. Baarman.  Well, Mr. Baarman, all I can say about Mr.

1290

Baarman is he kind of plays both sides of the field.  Right?  And he does it if you pay him.  And if you look at kind of when he's saying, yeah, your stuff's just worth a nickel or a dime, he's talking about that when he's in the thick of the WPC.  He wants you, Doctor Partovi, to give up your life's work, a decade of your work, give your patents away for free, make a nickel or a dime.  And then he comes back around and he's like, oh, you want me to be your licensing agent?

THE COURT:  Eight minutes have been used.

MS. TRUELOVE:  Thank you, Your Honor.

Now it's worth 8 bucks -- sorry, now it's worth 12 bucks.

So let's talk about the credibility of the damages case.  What do we know Samsung didn't do?  Mr. Repice said, yeah, we didn't do a survey.

You heard from Ms. Rowe, I have a colleague, Doctor Weber; she was hired up by Samsung.  She has the same qualifications of Doctor Reed-Arthurs.  She could have done a survey but didn't do it.

Mr. Bergman walked you through in great detail his methodology, and he told you where you start is by the use made of the invention by the infringer.  And that is the key aspect of any comparability analysis.  Any.

And what do we know?  We know that all Ms. Rowe did was a comparability analysis.  All she did was cherry-pick two patents.  And what do we know about those patents?  They're

supposed to be economically and technically comparable. And the first thing Dr. Burgess did when Doctor Zane got on the stand was get him to tell you that, yeah, I didn't really do an opinion on that, I didn't really look at all the patents in those license agreements to see if they're technically comparable. And, guess what, Samsung didn't ask me to do it.

Why? They don't want you to know that. They want to get something for nothing.

No evidence of use. And when I think about those two patents, those two license agreements, the picture in my head is trying to put socks on a rooster. You can't do it. I mean, I have a house cat. There's also a bobcat running around in our neighborhood. I'm pretty certain that she has taken out a couple of dogs. Right? My cat wouldn't make it a day outside, and you can bet I'm not inviting that bobcat into my living room. They are both cats, but they are two totally different animals. You didn't get the comparison.

So what did Bergman do? Mr. Bergman looked at, you know, what was going on. And he told you what Doctor Partovi was doing and -- and tried to build that bridge for you, and he was regularly going to people saying, yeah, $2, $2 to $3. We brought you a survey. We brought you both approaches. We brought you the income approach, Doctor Reed-Arthurs did that, and Mr. Bergman took her analysis and broke it out, and then we brought you the market approach.

And when you think about it, you have two willing people sitting down at a table, licensor and licensee, and what would you expect?  Ms. Rowe tried to suggest we're just trying to throw Doctor Partovi's numbers out there, but he is giving Samsung the benefit, giving them the benefit for the work they've done in wireless.

And so at the end of the day what it is and what we believe is just and right is $303.5 million.  Nobody disputes the units.  This should be a running royalty.  Doctor Partovi should be paid for the use of his inventions, and this is the amount he should be paid.

I'm now going to turn it over to my partner, Mr. Pollinger, for him to talk about more of the evidence in this case.  But thank you very much for your attention, and we look forward to your verdict.

THE COURT:  Mr. Pollinger, would you like any warning with regard to your remaining time?

MR. POLLINGER:  Yes.  The objective is to save 10 minutes for the rebuttal closing.  So the 25-minute mark, please.

THE COURT:  I'll warn you when the total of 25 minutes have been used.

MR. POLLINGER:  Thank you.

THE COURT:  Please continue.

MR. POLLINGER:  So, members of the jury, I'd like to

tell you -- refresh your memory as to how we got here.  How did we get here?  Why are we here?

Well, as you heard from my law partner, Ms. Truelove, Samsung is trying to get something for tree.  And what was happening?  Samsung was dangling to Mojo, to Doctor Partovi, the prospect of a win-win relationship, urging Doctor Partovi/Mojo to share their technology, teach Samsung, and to do all sorts of work for Samsung, promising the prospect of a win-win relationship.

But that never happened.  What happened instead was ultimately Samsung said, we cannot accept a business model under which Samsung pays Mojo.  Samsung was not willing to pay Mojo.  Instead, Samsung and these other companies wanted Mojo to join WPC, the Qi standard, so that Samsung and these other companies would get Mojo's patents for free.

Well, let me tell you a little bit about Mojo Mobility.  How was Mojo Mobility formed?  Well, as we heard during this trial, Doctor Partovi was traveling with his young family at the time, traveling with his wife and his two daughters who have stuck with him these last 20 years at Mojo Mobility--again, a credit to them.

And while he was traveling with them, he had all this jumble of wires and charging blocks.  And he came to the conclusion that there's got to be a better way.  That was his genesis of starting Mojo Mobility.  And his solution was to

get rid of all these wires, to have a wireless charging pad and add the receiver technology to all these devices so they could be wirelessly charged.

They started working diligently--Doctor Partovi, Mr. Sears--in Mr. Sears' living room. And they knew--thank goodness they knew--of the importance to file for patents. They filed for patents promptly, in 2006, in 2007, in 2011, to perfect their inventions with the Patent Office. And they worked hard at the business. Doctor Partovi and Mojo Mobility worked hard in the business as we see in this timeline.

In fact, at the start of the business, he put his own funds in. They moved out of the house, they rented the house out, to put the funds into the business, and their work paid off. They were recognized for their pioneering work. They were recognized as the hottest company for the work on wireless charging. They eventually got into their own space. They kept working hard.

Well, what was happening? Samsung was dangling the prospect of a win-win relationship. It never happened. Instead, Samsung took the technology and rolled it into its products, starting in March of 2015, and then later in August 2015 adding it, adding the high speed wireless charging that's at issue here, including the Qi standard, the Qi standard that they wanted Mojo Mobility to join so that they could get the patents for free, putting this all into the accused products.

All these accused products, as it turns out, were using the invention that Mojo Mobility had perfected and filed with the Patent Office and perfected the disclosures in 2006, 2007, and 2011.

And when Mojo Mobility saw that, saw that Samsung was on its land, for example, with respect to the '440 Patent, using the inventions from its priority applications, Mojo Mobility went to the Patent Office and filed for new claims, to bring claims against Samsung and for what Samsung was using in its products.

Thank goodness for the continuation practice allowed at the Patent Office.  Mojo Mobility did this for all of its patents here, did this through 2022 to bring claims against Samsung for its use of its inventions from its priority applications.  That's what resulted in the eight claims at issue here.

Doctor Partovi invented a complete and comprehensive solution to wireless charging, provides high efficiency, rapid speed, and broad interoperability.  These inventions, these disclosures, they were published.  They've been cited thousands and thousands of times by later patents.  We see that here in the publications of these three at the Patent Office.  They've been cited thousands and thousands of times by later patents.  They've been used by later patents.

As to the issue of willful infringement, as you heard in

the instruction from the Court, one way to assess willful infringement is, was Samsung indifferent, did it have indifference at the patent rights of Mojo Mobility.  Well, they certainly had knowledge of the patents.  Mojo Mobility repeatedly told Samsung about the patent filings in 2008, and then in 2009 at this large meeting with 20 Samsung in attendance requested by Samsung, Doctor Partovi told Samsung about Mojo's patent filings.

Then again in 2014, Samsung asked for the patent list, and Doctor Partovi provides it.  In 2017 the patent list is sent again to Samsung.  In all these emails, repeatedly Doctor Partovi told Samsung about these patents.  In this timeline, extensive timeline, Doctor Partovi repeatedly told Samsung about its patent filings.

Well, Samsung's got this business -- this view that it cannot accept a business model under which it pays Mojo Mobility.  So it has to come up with excuses, and the excuses it is coming up with are extreme.  They're extreme because it cannot accept a business model under which it pays Mojo.

Samsung uses extreme cartoons to describe its extreme defenses.

As to infringement, the burden of proof here, as we heard my law partner, Ms. Truelove, is a preponderance of the evidence, the same standard as to willful infringement.  On infringement, whether Samsung knew about the patents is

1297

irrelevant.  It doesn't matter on infringement itself, but certainly Samsung knew about Mojo's patent filings.

Samsung may say it operated in good faith, but there's no proof of good faith.  But good faith is irrelevant to whether there's patent infringement.  And there's no requirement of proof of copying with respect to patent infringement.

Now, Samsung did learn a lot from Mojo Mobility over the years.  The patent applications, the priority patent applications were published they were available to Samsung.  Samsung was told about the patent filings, but proof of copying is not required.

What is required is looking at these eight claims carefully and what is required is assessing the technical evidence carefully.  And Professor Ricketts did just that.  He took those eight claims, and he took -- dissected them and made sure he put each part in a separate box.  He put them in a separate box to make sure he assessed them.  You sat through this.  You were patient to sit through this.  He checked them all off.  He confirmed that they were there.  And when he confirmed that they were there, he checked them off.  He did this one by one.  You sat through all this.  You were patient.

So what does Samsung say on infringement?  Samsung's got these extreme defenses using cartoons.  They've got four defenses on infringement.  We see them here.  The first one is authentication.

1298

Before I get to that, as the Court instructed you, you are to use the Court's definitions, the Court's claim constructions. You've got four in your notebooks. There is no dispute in this case on these. Samsung's not trying to weasel out of infringement based upon any of these. The Court also instructed you as to claim limitations that have not been construed. You are to use the plain and ordinary meaning of that term as understood by one of ordinary skill in the art in light of the specification.

In light of the specification. This brings us to the '440 Patent with the authenticate term. This is the one Samsung is fighting so hard on because they think they can get out of paying a couple of hundred million if they can fool you on this one with authenticate. Well, you've got to look to the ordinary meaning; you've got to look in light of the specification.

And what does the specification of the '440 says? It says it's authenticity, for example, its manufacturer code. Well, what's the extreme position instead taken by Samsung and its experts? They say, well, the '440 Patent, that authenticity requirement, that's got to be counterproof -- that's got to be counterfeit proof, counterfeit proof. That's what Mr. Lee said.

And Doctor Zane, he said, oh, it's got to require a password. There is no requirement in the '440 claims that's

counterfeit proof.  There's no requirement in the '440 claims that you have to have a password.

Doctor -- Professor Ricketts explained that to meet the authentication requirement of the '440 claim, it's enough that you've got a manufacturer mark.  That's the way a person of ordinary skill in the art would understand meeting this claim limitation.  And there's no dispute that the Samsung products send the manufacturer code.  That's required by the Qi standard.  There's no dispute as to that.  That first defense is an extreme defense.

The next one is also an extreme defense.  They argue there's no current modulation or detection.  Well, the standard requires, the WPC standard requires that there be modulation of the current.  And what Samsung argues to try to defend this is they try to say, well, there is impedance modulation; oh, we're detecting the voltage.  Well, the fact of the matter is that impedance, voltage, and current are directly related.  They're tied together.  They move together. So if you modulate impedance, you modulate in currents.  If you detect voltage, you detect current.  This is not a good defense.

Next defense:  No operation near resonance.  This is another extreme defense.  The way Samsung reads this, the way that Samsung reads the patent claims is, oh, you've got to be so close to resonance, right on top, the tippy-top where

things fall off, that your phone is at risk of starting on fire.

And they say, well, we don't make our phones to start on fire. And they also say you have to be so close that this wine glass here in their cartoon from the opera singer, the wine glass is going to explode. The claims were not written in a way in 2021 and 2022 to require that the phone explode. Use your common sense. That's an extreme defense.

Everybody agrees that the way the phones work is they operate in that zone that we see there on the right. That's the zone that allows you to adjust the power by adjusting the frequency, just as the claims require.

They all agree that in that zone that that where you operate, when you adjust the frequency, the power is adjusted, and you're in a zone where the charging actually works. You can activate the receiver and you can charge the battery. There's no requirement of an explosion or a fire in the phone. That's an extreme defense.

The last defense is also an extreme defense:  No uni-directional communication mode. Well, everyone agrees and Samsung agrees their products are backwards compatible. The high speed capable phones are backward compatible so that they can charge wirelessly on first and second generation chargers, baseline chargers.

THE COURT:  25 minutes have been used.

1301

MR. POLLINGER:  Thank you, Your Honor.

And in the baseline chargers, you have uni-directional communication.  There's no dispute on that.  Samsung in their defense wants to ignore what you see there on the left.  And even in the bi-directional, it starts out uni-directional.  Another extreme defense.  Their defenses do not add up.

This fork in the road?  This cartoon?  Completely inaccurate.

What really happened what's really happening is Samsung in its products by way of incorporation of Qi and the other things, is using what's taught in the Mojo patents, the priority application, and what's claimed in the eight claims here.  They're driving right over the top of the five Mojo patents here.

Regarding validity, we've heard there's a presumption of validity.  The issued patent is presumed valid, presumed the Patent Office knew what it was doing.  We heard that it requires clear and convincing evidence, the heavy burden of proof.  And on obviousness, and this is important, on obviousness you don't just look if you can find a whole bunch of references and find all the pieces looking here and there and everywhere and then say, oh, well, geez, we found all the parts.  That's not proving obviousness.  If that was the case, every invention would be obvious because, as the Court instructed you, most inventions rely on making new

combinations of pre-existing parts.  Like a new recipe, you take existing ingredients and you combine them in a new way.  You don't have to make new ingredients to make a new recipe.  A new combination.

Here is what Samsung tries to do.  They try to piece together bits and pieces from 14 different references, using hindsight, using the patent claims as a roadmap saying that, oh, these were all obvious, trying to put the pieces together by taking bits and pieces and following the roadmap of the patents.  They try to combine three references, four references.  They have not shown by clear and convincing evidence that the Patent Office got it wrong and that these eight claims here are invalid for obviousness.

And the only one who is saying this is Doctor Zane.  He's the only one saying this.  And as we heard Samsung's lawyer, they helped him right that 800-page report.  He only spent 40 hours on it.  And Doctor -- and Professor Ricketts told us that he has reviewed Doctor Zane's invalidity analysis, and he has determined that the patents are valid.

And as you heard my law partner, Ms. Truelove said you've got to use common sense.  If these things were so obvious as they're saying now, taking bits and pieces from all these 14 references, why did it take Samsung 11 years to finally bring a wireless charging product to marketplace?  They're not obvious.

On the verdict form, I want to step you through quickly with this.  Your first question will be on infringement.  You've seen the extensive evidence, the claim-by-claim, part-by-part analysis by Professor Ricketts.  On each of these questions, I submit the answer should be, yes, there is infringement of each of these claims.  It has been proven by a preponderance.

As to validity, which requires the clear and convincing evidence, the heavier burden of proof, I submit Samsung has not proven that the Patent Office got it wrong eight times, has not proven obviousness.  I submit that your answers on all these questions should be no, no to invalidity.

As to willfulness, I submit your answer should be, yes, Samsung knew about the patent filings, Samsung was constantly asking for information from Mojo Mobility, Samsung had the policy that it cannot accept a business model under which it would pay Mojo Mobility.  Samsung was indifferent; Samsung was a willful infringer.

And as to damages, like my law partner, Ms. Truelove said, the damages should be just over $303 million, $303.5 million, in particular that number there.

And in terms of the last question, running royalty or lump sum, it should be a running royalty.  Samsung shouldn't get these patents for free going forward.  Samsung has been trying to get these patents for tree, trying to get Mojo

Mobility to join WPC, but Samsung should not get them free through the expiration of these patents in 2027.  I submit you should check the box there, running royalty.

With that, I'm going the sit down and I'll have a few more minutes to address to you, probably about 10 minutes, after Samsung's counsel speaks with you.

Thank you.

THE COURT:  Defendants may now present their closing argument to the jury.

MR. UNIKEL:  Thank you, Your Honor.  May I have just one moment to get set up?

THE COURT:  Would you like a warning on your time, Mr. Unikel.

MR. UNIKEL:  Yes, please, Your Honor.  Would it be possible to get one at 20, one at 10, and one at 2?

THE COURT:  20 minutes remaining, 10 minutes remaining, and 2 minutes remaining.

MR. UNIKEL:  Yes, Your Honor.

THE COURT:  I'll give you those warnings.

MR. UNIKEL:  Good afternoon.

Before we begin, I really want to echo the thanks of everybody.  I know it's been a long week.  It's been an intention week.  There's been a lot of facts, a lot of evidence, a lot of hours.  We really do appreciate the attention that you've all obviously given, your consideration

1305

of all the evidence and your listening to all the facts and the witnesses.  Everybody on our team, for Samsung, really appreciates your effort.

We all know someone who at one time or another thinks they've come up with an incredible idea for a product, for a business, and only to find out when they really start digging into the idea, that either somebody has done it before or it really wasn't that big a hit as they thought it was going to be.

If you've ever watched the TV show *Shark Tank,* I think you've seen really committed inventors, really committed business people, who find out the hard way that their business isn't quite what they thought it was when they don't get a deal in the tank.

Now that's exactly what happened here.  In 2005 Doctor Partovi formed Mojo to start developing ideas for wireless charging products.  But Doctor Partovi -- he and Mr. Sears had not worked with wireless charging before 2005, so they were not aware that many companies, including Samsung, had already published about wireless charging products for years.  Samsung and other companies had already started to develop actual wireless charging products for cell phones and other portable devices years before Mojo was formed.

Mojo had very specific ideas and approaches to wireless charging.  They required technologies in their claims like

phone authentication operation near the resonant frequency, sensing and modulating current, and a uni-directional communication mode, all as part of the Mojo approach.  You've seen that in the claims.

But the industry, including Samsung, was already going in a different technological direction using different approaches to wireless charging when creating the Qi standard.

And Mojo did not want to participate in the creation of the Qi standard.  Mojo told you they didn't want to participate because they didn't feel they would get paid enough if they participated even though participation offered tremendous opportunities for patent licensing which is why hundreds of companies, big and small, were willing to join.

As you heard from Mr. Baarman who helped to create the WPC, the royalty-free obligation only applied to low power receivers, not to all of the other types of products that are sold in the space.  So there were ample opportunities for Mojo or any small company to make money.

But Mojo chose to turn down the invitations from the WPC to be part of the standard-setting effort and went in its own direction.  It tried to form a different industry standard that simply didn't catch on.  Now, Mojo was free to make that choice, of course, but it can't complain now that the industry went in one direction and they went in the other direction, because we know that's exactly what happened.  The industry

1307

went about putting out the Qi standard in 2010, and this became the dominant industry standard, as everybody agrees.

Samsung and many other companies launched their own commercial products that complied with the Qi standard and that did not use Mojo's approach.  Samsung introduced the Droid 11 wireless charging case in 2011, six years before Mojo's first patent issued.

Now, as Mr. Lee explained, the only reason Samsung didn't come out with a product sooner was because until 2010 the sizes and prices of integrated chips from third party vendors was still too high.  Once chip manufacturers were producing cheap enough and small enough chips, Samsung was able to launch its products.  Samsung then introduced the S3, S4, S5, S6, and S7 phones, all with wireless charging capability, before Mojo's first patent in this case issued.

Meanwhile, Mojo could not get its products to work -- its technology to work in any actual products.  From 2005 until today, Mojo has not actually produced or launched a commercial product using its specific technological requirements.  And from 2005 until today, despite spending an enormous amount of effort trying to sell people on the benefits of approach, Mojo has been unable to persuade even a single company to pay anything to license their patents.

Tellingly, Mojo itself stated in this case that it never practiced, never used, the technologies required by the

1308

patents.  Take a look at DX 15 and DX 16 to see this for yourselves.  And in 2013, when Mojo sent prototypes of some products to Samsung to try and interest Samsung in a potential partnership, Mojo sent product prototypes that did not include the technologies and approach that's included in these patents.

And those Mojo prototypes did not perform well, as you heard from Mr. Lee who did the testing, certainly not up to Samsung's requirements.  They had size, efficiency, and overheating problems.

Mojo itself told Samsung that what Samsung wanted was not possible with Mojo's technology at the time.  Mojo said it couldn't make a device that met Samsung's very stringent technical requirements, which were provided to Mojo.

Now, at some point during the trial Mojo's counsel asked why are the prototypes relevant here.  They're only relevant because Mojo has tried to suggest that Samsung somehow learned about Mojo's patented technology from the prototypes and then incorporated that technology into their later products somehow.  But we know that can't be true because we know that the prototypes didn't even use the inventions that are contained in the issued patents here.

The prototypes are also relevant because Mojo keeps pointing to the 133 emails that the companies exchanged in 2013 as some sort of evidence that Samsung desperately wanted

Mojo's technology.  But the emails in 2013 were almost entirely about the testing of Mojo's prototypes and Mojo's inability to correct the problems that Samsung had detected during the testing.

So the 2013 emails certainly don't suggest that Samsung was trying to get insight into Mojo's patents, because the prototypes were not part of the patents.  In fact, not surprisingly, Samsung told Mojo that they could not do business together because the prototype was not commercially viable.  And Mojo never again sent a prototype to Samsung. Never.

And after 2013, there was extremely little communication between the companies.  Mojo tried to slip that fact by you by leaving out of its graph the years 2015, 2016, 2018, 2019, 2020, and 2022.  And in all the emails counted up by Mojo, Mojo never once said to anyone at Samsung that Samsung was somehow, some way, using Mojo's technology, that they were somehow infringing Mojo's patents.

The Judge has instructed you that you are the judges of credibility and believability of the witnesses.  Mojo's entire case is built on trying to persuade you that Samsung is using their technology without permission.  Yet not once before this lawsuit, in not a single one of those 300-plus emails, did Mojo ever say to Samsung that "you're infringing or using our technology."  Does that make sense to you?

1310

If Doctor Partovi really thought Samsung was using his patented technology, costing him millions of dollars, does it make sense he wouldn't tell Samsung a single time that they needed to take a license to his patents?  What they said and didn't say outside the courtroom does not match up with what they're telling you inside the courtroom.

It's easy to understand that all of this was very disappointing, perhaps even shocking to Doctor Partovi and to Mojo.  It's tough to learn your ideas aren't as unique as you thought they were.  It stings to find out that customers in the industry are not as interested in your approach as you would hope they'd be.  But that's what happened to Mojo over the course of 17 years.

And so in 2022 Mojo filed this lawsuit without ever giving Samsung any advance notice that he thought they were infringing the patents in the hope of making some money from a the claim of patent infringement based on technology that Mojo could not turn into products in the real world.  But Mojo's disappointment and frustration doesn't entitle them to ask for $300 million from Samsung who developed their products on their own as the result of hard labor, using their own technology.

Ultimately this case is about the evidence.  You've now seen the proof that Samsung and other companies had designed wireless charging technology years before Mojo was formed and

filed its patent applications.  They were asking, where was Samsung's patent?  There was the Sagoo patent, JX 189.  There was the 2001 article, DX 1; the 2004 article, DX 2, and the prototypes that were shown in those articles.

The research and product design work included all of the core elements of wireless charging:  Planar coils, to make them thin, use of multiple coils, universal charging capability, fast charging, communications between the transmitter and receiver, and authentication of the phone.

Look hard at that Sagoo patent.  You'll see authentication was known by Samsung before Mojo's patents were filed.  But Samsung elected not to include that in its products.

You've seen proof that Mojo elected not to be part of the WPC and the Qi standard-setting effort, but the Qi specification was published in October 2010, more than six years before Mojo's first patent issued.

Recall the Judge's instruction on credibility.  Mojo now wants you to believe that Samsung's use and frankly anyone's use of the Qi standard would infringe his patents.  If that was true why wouldn't Mojo have told that to the WPC when it was invited to join?  Why didn't it just decline membership and say, we already have invented that, you're using our patents if you incorporate that into the standard.  Mojo never once made that claim to anybody at WPC until in this case 12

years after the Qi standard had issued.

You've seen proof that Samsung's products used and continue to use the industry standard approach that does not use the specific technologies in the patents.  And you've learned why Samsung doesn't include those technologies.

Samsung products don't include authentication of the charger -- of the phone by a charger.  They don't include sensing and modulation of current.  They don't use operating frequencies that are near the resonant frequencies.  They don't include a first mode that has uni-directional messaging.

And you've heard from two of the Samsung engineers directly involved in creating the Samsung products; you've seen the technical documents, including the Qi standard; you've heard from Doctor Zane, who studied all of the available materials.  You've seen and heard the proof that Samsung does not include these things because these technologies actually harm and limit the performance of their wireless charging devices.

You know that for a fact because Mojo could never actually produce a technologically, let alone commercially viable product using its own approaches.  So simply put, Samsung cannot possibly infringe patents that call out specific technical features when Samsung does not use the technical features.

And it's absolutely critical, ladies and gentlemen, that

it's Mojo's burden to prove infringement by a preponderance of evidence. Just to be clear, that piece of paper goes both ways. If the piece of paper, one piece of paper falls on Samsung's side of the scale, they have not met their burden of proof.

They must show that every single thing listed in the patent claims is actually present in Samsung's products. And that burden of proof really means something because if Mojo wants you to award them millions of dollars, then they have to prove with real evidence that Samsung's products include the features.

Even Doctor Ricketts admits that the law says that if one single thing in Mojo's patent claims is missing from the Samsung's products, then Samsung does not and cannot infringe. This makes sense because a patent claim is like a property deed. It needs to be very precise about what it is and what is not part of the invention. And the invention must include everything, as you heard in the judge's instruction, everything that's in that claim.

Mojo bears the burden of proving infringement, and the evidence here shows that Samsung does not infringe.

This is where I want to take you back to the question I asked you last week--what exactly did Mojo invent? You've seen that every single thing, every single concept, every single element, was already published in the industry and

1314

known to companies like Samsung years before Mojo filed its first patent application.

While some of this art was cited in that '942 Patent, it was not presented to the Patent Office in connection with the '440 Patent which was the first patent filed and issued. Doctor Zane explained, in light of what was published before Mojo was formed, Mojo's patent claims would have been obvious to a person of skill in the art.

Now, Mojo did not ever dispute that all of the elements of the patent claims are actually disclosed in prior art references. They never disputed that. Instead, they said that there was no single reference that had everything, but as the Judge informed you, this case is about obviousness.

Doctor Ricketts' only response was to say this was like a puzzle that Doctor Partovi put together. But putting together a ten-piece puzzle is not that hard to a skilled person in this industry who already knows how the pieces fit. And the puzzle pieces here were created by Samsung, Calhoon, Kook, Sagoo, and other inventors long before Mojo filed for its patents.

But despite all the evidence, Mojo still says they invented something. But what is it exactly? Ignore the big bold claims of I created a universal charger. Try to put your finger on what is it that they actually invented, what was new.

Think back to Doctor Partovi's testimony at trial.  He didn't even try to identify a problem with the wireless charging prototypes and solutions that were disclosed in the publications he was aware of.  He didn't point to a single specific thing that he fixed or that was broken or that he added to what had been done before.  He didn't even bother to go through his actual patent claims with you to point to a single thing in those claims that he actually contributed; something that was the special sauce.  It was never done.

He made big bold claims about creating an entire wireless charging system.  But think back carefully, what did he say about how he did it or what he was correcting in what existed in the art already?  He was the inventor.  Why couldn't he do that?  Why didn't he do that?  It's another fact to consider when weighing the credibility of the witnesses in this case.

So what exactly did Mojo invent?  If they invented anything when they put together the puzzle pieces from Samsung and the other prior artists, it was something -- it had to have been something so narrow and so specific, even though it's been undefined, that it just wasn't used by the other companies who went the Qi standard direction.  The invention certainly was not worth $300 million to Samsung or anyone else in the industry.

Think carefully about the evidence that Mojo is really relying on in this case.  They spent a very large amount of

time at this trial pointing to the number of emails between Samsung and Mojo over the years.  It seems they want you to conclude that Samsung somehow learned about wireless charging technology from Mojo.

They want you to ignore that Samsung had done its own pioneering research and applied for its own patents before Mojo existed.  They want you to ignore that most of the communications between Samsung and Mojo were either high level discussions where Mojo was trying to sell its technology to Samsung or in 2013 they want you to ignore that most of the emails were about the problems with Mojo's prototype that it sent.

And they conveniently ignore and eliminate from their slides that there was virtually no communication after we told Mojo that their prototypes would not work.

Doctor Partovi admitted Samsung never expressed any interest in paying for Mojo's technology or patents because Mojo's technology and patents were not desirable or workable for Samsung's products.  And, again, Mojo wants you to ignore the fact that never once from 2008 to 2022, in all of those communications, in all those emails, Mojo never told Samsung that they were using Mojo's technology, not a single time.

Mojo spent a lot of additional time at trial trying to tell you that Doctor Partovi worked hard over the years to try and generate interest in his technology, and now he wants to

get paid for his work.  But that's not how the world works.  Anyone who's ever worked in sales knows that you work very hard trying to make sales, trying to interest customers in your product.  Sometimes you have to work with the customer to change your product, modify things in order to get them to make a purchase, to buy.

But if the customer ultimately decides that the product is not for them, you can't say, but I deserve to get paid, I worked really hard trying to sell this to you.  The people who don't get deals on *Shark Tank* can't demand payment from Mark Cuban because they worked really hard producing their businesses and making their pitches.

While it may be hard for Mojo to accept, Samsung never offered them a license because their technology was not interesting to Samsung.  Samsung did not want to do the things that are called out for in the patents, and they didn't.

Make no mistake.  Samsung was very interested in wireless charging technology.  That's why it started its own research and development task force all the way back in 2000 and why engineers like Mr. Lee put in more than 45,000 hours of their lives working on this technology.  Samsung just didn't have interest in Mojo's specific technology because it was not workable or desirable for Samsung's products.

On the infringement front, their case boils down to a bit of hand-waving because the prove is very clear in favor of

Samsung.  Let's look at it.

First, the '440 Patent claim clearly requires that the charger detect, identify, and authenticate the receiver, three things.  So the claim and the patent description are clear that there must be something more than mere identification to assure like a receiver like the phone is genuine, something to verify that the identifying information like a manufacturing code is real and authentic, similar to a password that verifies a username or a passport that verifies the identity of an airline ticket holder.

THE COURT:  20 minutes remain.

MR. UNIKEL:  Doctor Ricketts admits if there's no authentication of the phone, there's no infringement.  The only thing that Doctor Ricketts and Mojo point to as supposedly satisfying the authentication requirement is the portion of the Qi standard identification packet that is the manufacturer's code.

But the Qi standard is clear that the code only identifies a manufacturer.  Please, take a look at JX 135 when you go back to the jury room, page 100, to see for yourselves what the Qi standard says about the identification packet.  As testified to by the Samsung engineer that helped create the Samsung products, Mr. Lee, neither the manufacturer's code or any other information in Samsung's products can be used by the charger to authenticate the device.

Doctor Zane confirmed this in his detailed analysis. And, in fact, as you might remember that, as Mr. Lee explained, in recent years Samsung's fast charging products have started to authenticate the charger because they're concerned about false chargers sending too much power to the phone. But Samsung's products never have the charger authenticate the phone, never, because that would get in the way of operability with other products.

Here are two phones. They both say Samsung on them. They both identify themselves as Samsung's products. One is a counterfeit; one is real. If you put both of these in a charger, there is no way for the charger with the manufacturer code to figure out if one of them is counterfeit or one of them is real. It's not in Samsung's products. It simply doesn't exist.

Because, as Mr. Lee explained, requiring a phone to be authenticated isn't necessary for safety. It would be technologically problematic and it would get in the way of interoperability with other products. That was undesirable to Samsung which is why they deliberately kept phone authentication out of their products.

So Mojo simply cannot satisfy its burden of proving infringement on the '440 Patent. And Mojo is right, critically, the vast majority of Mojo's requested damages are for infringement of the '440 Patent. A finding of

1320

non-infringement on the '440 Patent means that any Mojo damages that you might find would have to be cut by 70 percent.

Now, the '371 Patent, claim 28, '942 Patent, claim 21, explicitly require sensing and modulating current. It's right in the claims. You can see it clear as day. Once again, Doctor Ricketts admits that if Samsung's products do not sense and modulate current, there can be no infringement.

Doctor Ricketts also admitted that current is a different value, a different thing in electricity than voltage or load or impedance, just like the amount of water flowing through a river is different from the depth or the steepness of the river bed or the rocks in the water that impede its flow.

The evidence uniformly proved that Samsung's products use voltage sensors and modulators, not current sensors or modulators. That was clear from the testimony of Mr. Lee and Doctor Choi. It was clear from the documents which showed only voltage sensing circuits.

And if you think back, even Doctor Ricketts admitted that Samsung actually senses and controls voltage, not current. What he suggested is that because voltage can have an impact on current, you can somehow ignore the fact that Samsung actually senses and controls only voltage. He referred to the fact that when you turn on an AC, you can cause a dimming of the lights. But if the patent specified that a light needed

to be dimmed using a wall switch, then dimming the lights by turning on your AC would be something very different.

Here the patent claims are very clear that current must be sensed and modulated, not something affecting current, not something that is related to current, but current must be sensed and modulated.  And there's no real dispute that Samsung does something distinctly different.

Mr. Lee and Doctor Choi and Doctor Zane all explained to you how sensing and modulating current is complicated.  It's inaccurate and it's inefficient.  That's why Samsung deliberately disables current sensing and modulation in the chips that it buys, and it uses voltage sensing instead.

So Mojo simply cannot satisfy its burden of proving infringement on these claims.

The '500 Patent, claim 23, and the '942 Patent, claim 21, explicitly require operating near a resonant frequency.  Once again, clear as day in the claims.  And, once again, Doctor Ricketts admits that if Samsung's products do not operate near the resonant frequency, there can be no infringement.

On this issue the facts are essentially undisputed. Doctor Ricketts and all the Samsung witnesses agree that the resonant frequency for Samsung devices is around 77 kilohertz, and the operating frequency for all of Samsung devices is a range of 110 to 148 kilohertz.

In fact, Samsung's engineers and the documents made

crystal clear that Samsung deliberately sets its operating frequencies far from the resonance frequency to avoid component damage, inefficient operation, and even to avoid fires in the phone because it's not that all fires would be -- all phones would be set on fire.  It's that if you wanted a thin phone with capacitors that can handle a certain amount of electricity, then you can't get too near the resonant frequency.  To handle it, you'd have to have a much bigger phone with much bigger electronic components inside it, and Samsung did not want that.

Doctor Ricketts points to the figure and tries to suggest that the operating range in the red is near to the resonant frequency.  But Doctor Ricketts compressed the figure so you don't actually think about or realize how big and how important the difference is that Samsung selects.  It's kind of like looking at the map.  If you look from far enough out, cities like Marshall and Tyler look like they're right next to each other.  But when you really focus in, you realize they're much further away than they originally appear, around 60 miles.

I don't think there's much doubt that if someone got in a cab, asked for the fare, and the driver said, near to $75, and then charged the person 110 to $148 dollars when they arrived in Tyler, the passenger would not think that the fare was near to $75.

1323

As Doctor Zane explained, the patents require placing the operating frequency far from the resonant frequency. And for very practical reasons, Samsung does not put its operating frequencies near the resonant frequencies. So, once again, Mojo simply cannot satisfy its burden of proof, and it is Mojo's burden of proof on these claims.

Finally, claim 15 of the '777 requires that the devices charge at two power levels and there must be two modes, including a first mode that uses only uni-directional messaging. Once again, Doctor Ricketts admits that if there's not a first mode that uses only uni-directional messaging, there is no infringement.

But Doctor Zane and Mr. Lee explained to you and showed you the documents proving that Samsung's fast charge devices use Samsung's unique fast charge protocol that only has one mode and that mode is fully bi-directional.

Now, assuming you credit Doctor Ricketts on this, Doctor Ricketts thinks there are two modes, but he couldn't have been clearer when the second mode starts. In his view, the second mode starts with the sending of the packet called the PP_SET.

Well, you can see the PP_SET here in the figure from one of Samsung's fast charging protocol documents that Doctor Ricketts actually pointed to, a document that Mr. Lee actually wrote and testified about. So according to Doctor Ricketts, everything above the PP_SET is in the first mode. And despite

1324

Doctor Ricketts' effort to confuse you by coloring in some arrows and selectably picking some of the arrows, this is bi-directional communications.

As Mr. Lee very simply explained, the arrows are going in both directions. Doctor Ricketts tries to pick only the arrows going in one direction to say that these communications are really just uni-directional. In his words, you have to start by speaking German. That's like ignoring one-half of a text exchange. If you only look at the text that you send to somebody and ignore theirs, you might say it's uni-directional. When you add their responses back into the text exchange, you realize the exchange is bi-directional. You can't just pick and choose.

All of these communications are in the first mode, according to Doctor Ricketts, even though the truth is there's only one mode in these products.

Mr. Lee explained that Samsung uses bi-directional communications for fast charging because they need the devices to know that their signals are good, that they're actually communicating. They need the charger to respond back, I'm here and, yes, I speak English.

So, once again, no matter which expert you believe, Mojo simply can't satisfy its burden of proving that Samsung's products infringe the '777 Patent.

THE COURT: Ten minutes remaining.

MR. UNIKEL:  When it comes to damages, their case boils down to Doctor Partovi's stubborn expressed interest that his royalties for the patents should be $1.75 to $2.50 per device.  Think about it.  Their damages expert, Mr. Bergman, went through a whole complicated analysis only to end right back where he started, saying that the only royalty rates that Mojo would accept in the hypothetical negotiation are the exact royalty rates that Mojo pitched to tens of companies over the years with zero success.

Mojo is no different than a homeowner who puts his house on the market for a crazy high price compared to all the other houses in the neighborhood.  Here the comparable houses, the only houses that have been shown to you in the neighborhood, are the Seiko Epson house and the LS Cable house.  They were very comparable houses, also filled with wireless charging patents that went on the market and sold for $11 million and $9 million, roughly 6 cents to 7 cents per unit, or per square foot in this analogy.

As Doctor Zane and Ms. Rowe explained, they were comparable because the LS Cable patents and the Seiko Epson patents all related to the same kind of wireless charging technology applicable to the same set of Samsung products that are at issue in this case.

Now, at the end of the trial, Mojo tried to make a big deal out of the fact that Doctor Zane could not define the

amount that Samsung actually used the Seiko Epson and LS Cable patents. But the Judge just instructed you, and you'll see it in the instructions, that, quote, a party is not required to use or practice or have intended to use or practice patent rights in a license agreement for it to be a comparable license agreement.

So Mojo was just trying to confuse and distract you from the real importance of the Seiko and LS Cable licenses.

Mojo stubbornly decided to put its house on the market for $300 million at $1.75 or $2.50 cents per unit, more than 20 times the comps. And not surprisingly, there were no buyers of Mojo's house at that price; the price made no sense. Mojo tried to sell that house to buyers for more than 10 years. No one was interested, not a single taker.

Mojo then brought in an expert agent, Mr. Baarman, perhaps the world's most respected expert in this particular neighborhood of wireless charging to tell Mojo what they should be charging for the house. Mr. Baarman prepared a detailed analysis telling them that if -- that maybe they could get 5 to 20 cents per square foot-- per unit if they put some real money into fixing up their house.

But Mojo refused to put the money up to fix up their house, they refused the lower the price, they stubbornly insisted that their house was worth more than 20 times more than the other comparable houses. Well, not surprisingly, the

1327

market told Mojo that it is not worth what they wanted, and to this day, still no one has paid for -- a single dollar for a license to any of Mojo's patents.

But now Mojo now wants you, the jury, to give them what they cannot get in any table's length negotiation in the world. They ask you the give them their $1.75 to 2.50 square foot price that no buyer in the real world has ever shown a willingness to pay.

Now, if you find that Samsung did not infringe the patents or that the patents are invalid, then you don't even have to consider damages. There would be no damages. Your job would be done.

But if you do consider damages, Mojo is only entitled to the reasonable price of its house, not the $300 million price that makes no sense in the real world. As Ms. Rowe explained to you, that fair price is between $11.3 million and $13.2 million, at 6 cents to 7 cents per unit. This would be paid as a one-time, lump-sum amount, not as a running royalty which is just not how licenses are done in this neighborhood, in this area. You've seen the LS Cable, you've seen the Seiko Epson, and the other six licenses that Ms. Rowe pointed to that are all lump sum. That is right in the 5- to 20-cent range that Mr. Baarman advised Mojo that its patents might be worth.

And if you find the '440 Patent in particular to be not

infringed or invalid, then Mojo's damages drop by 70 percent, no matter what royalty rate you use, because while the '440 Patent issued in 2017, the other patents did not even issue until 2021 and 2022, just months before Mojo filed this lawsuit.

The last one, the '942, issued three days before they filed this lawsuit. And they're saying that we willfully infringed the patent that issued three days before the lawsuit was filed.

Under the law, Mojo is only entitled to a reasonable royalty if the patents are valid and infringed; not a windfall based on royalty rates that the market has shown were far beyond reasonable.

Here what is reasonable is 6 cents or 7 cents per unit for the time period of infringement, which for all the patents other than the '440 Patent could have only started in 2021 or 2022. Mojo's demand for $300 million just makes no sense based on facts in the real world.

One thing. There's a verdict form. Opposing counsel was taking you through the verdict form. I'm not going to waste your time. I'm pretty sure you can figure out how to fill out the verdict form yourself. The only thing I will tell you, there is only one group of questions you are required to answer. Those are the questions on infringement. If you find no infringement, you do not have to answer any of the other

questions, not on invalidity, not on willfulness, not on damages. Your job will be done if there is no infringement. And there is no infringement because Samsung doesn't use the technology.

Once again, ladies and gentlemen, the case comes down to the facts and the evidence. The evidence shows that Samsung and its engineers, like Mr. Lee, Doctor Choi, put in the hard work over many years to build their own wireless charging products using their own technology that dated back to 2001, 2004, their U.S. patent application for Sagoo, their task force that they set up in 2000.

The evidence shows that for real, practical reasons that have been explained to you and shown to you, Samsung does not use the specific technological requirements and approach that are required by the patents. We have provided reasons why we went in a certain direction. Doctor Partovi has not identified a single problem he was trying to address when creating his patents.

The evidence shows that because Mojo decided to go its own way, the entire industry created and adopted the Qi standard that does not use Mojo's technological requirements.

And the evidence shows that Mojo's demand for more than $300 million is totally unreasonable in light of the fact that the industry itself did not value Mojo's patents precisely because their specific technological features were not usable

or workable for Qi-certified products.

THE COURT:  Two minutes remaining.

MR. UNIKEL:  The evidence speaks clearly in this case.  The piece of paper, the extra piece, is on Samsung's side of the scale.

In a very real sense, real sense, not a comic sense although I have displayed it as a comic, I will confess, the industry went one way, Samsung and the Qi -- sorry.  Samsung and Qi went one way; Mojo went in a different direction.  That is a fact.

Mojo cannot satisfy its real and its critical burdens of proof in light of the evidence.  Based on the evidence, we ask you to return a verdict in favor of the Samsung Defendants in this case.

Thank you very much for your time and your very careful attention.

THE COURT:  Plaintiff may now present its final closing argument.  You have eight minutes remaining.  Would you like any kind of a warning?

MR. POLLINGER:  A one-minute warning, please, Your Honor.

THE COURT:  All right.  I'll warn you with one minute remaining.  You may proceed.

MR. POLLINGER:  Thank you, Your Honor.

Ladies and gentlemen of the jury, you have just heard the

aggressive, extreme arguments of Samsung because Samsung cannot accept a business model under which it pays Mojo.

Mr. Svenson, if we could please have slide 170.

Thank goodness for our U.S. Constitution that recognizes the importance of patents.  Thank goodness for our jury system which creates a level playing field for all parties.  And thank goodness for the Court's instruction that you are to use your common sense.

Let's talk about common sense.

Let's go to slide 25, please.

We heard all these non-infringement arguments, the four non-infringement arguments by Samsung, and they're extreme arguments.  They say, oh, one reason they don't infringe because if you did what the patent did, the phone would explode.  Or it wouldn't be backwards compatible, or it would have to protect against counterfeits or have to require passwords.

But these patents, they were filed as late as 2022 with the invention dates for the disclosures going back to 2006 and 2007.  Why would Mojo's lawyers file patent claims in 2022 based upon what Samsung's doing that they see in the priority disclosures back in 2006-2007 that requires things that Samsung's phones don't do, that requires Samsung's phones to explode, that require protection against counterfeits, that require passwords, clearly things that Samsung phones don't

1332

do.  It makes no sense.  It defies common sense.

And then we hear about prototypes again, criticizing Doctor Partovi, criticizing a small start-up company for not coming to market, for not being able to mass produce products like other companies do.  Well, Doctor Partovi testified clearly that his prototypes worked and Samsung was very interested in them.  Samsung had him come to Korea four times, had him go to Las Vegas to meet with Samsung team of 20 engineers, executives, and managers where he gave them a lecture on wireless charging for 30 minutes, and they had a 15-minute show-and-tell afterwards where they all came up and looked at his prototypes.

Use your common sense.

They say he didn't invent anything.  They said these patents are all invalid.  They were cited thousands and thousands of times by later patents.

Use your common sense.

These are extreme arguments by a company that has a policy and has had a rule that said we cannot accept a business model where we pay Mojo Mobility.

What extreme measures has Samsung gone to here?  Samsung has brought in Mojo Mobility's former consultant, former licensing agent, three contracts, paid him thousands of dollars.  They brought him in as a paid fact witness.  They brought him in -- they paid him $300 an hour to say what they

wanted him to say.

And when you looked at when he was a licensing agent, he said it would support about a $2.50 royalty.  What other extreme measures have they gone to?  They have written an 800-page expert report for the expert they hired, Doctor Zane, who only spent 40 hours on it.  They had a team of Samsung lawyers putting together this 800-page report that Doctor Zane only spent 40 hours on.

Extreme measures.

If you go to slide 169.

And what happened in the business interactions?  They had Doctor Partovi come to Korea to visit Samsung four times.  They say, oh, we knew everything.  We knew everything about wireless charging.  We had a crack team.  We knew everything.  These guys, they were just pie-in-the-sky dreamers, *Shark Tank* rejects, *Shark Tank* rejects.  They had them come to Samsung four times, and they sent a letter afterwards saying we look forward to a win-win relationship.

Use your common sense.  It doesn't make any sense.

Go to slide 90, please.

They say the patents are invalid.  They try to take bits and pieces for 14 references using after-the-fact, hindsight analysis which the Court said you can't do.  You can't do this hindsight analysis.

Go to slide 33, please.

Common sense.  They say Doctor Partovi, he knew nothing about wireless charging.  He and Mr. Sears, they were late to the game.  They didn't do anything.  Samsung had this team that knew everything, but they asked him to come to Las Vegas to present to this team, this team of 20, in 2009.

Common sense.  It makes no sense.

Slide 29, please.

These patents, the foundations for these patents, they were published in 2007, 2009, and 2012, and they were cited by -- the cited-by numbers thousands and thousands of times by later patents, cited thousands and thousands of times by later patents.  If they were nothing new, if they were nothing new and Samsung already knew everything, they wouldn't have been cited thousands and thousands of times.

Common sense.  It makes no sense what they're arguing.

Then on damages, let's go to slide 4.

They keep saying that Doctor Partovi is asking for too much money, pie in the sky.  Well, what they want to push him to and what they've always been trying to push him to is WPC, which would require him to give his patents away for free.  And they say, well, not everything.  But it requires him to give it away for receivers, low power receivers.  Well, that's most of the marketplace.

And all these large companies, sure, they want him to join.  They want his -- and why would they -- if he didn't

have anything, if his patents weren't of any interest to them, why would they have been asking him to join?  They were asking him to join because his patents were good.  They had good disclosures that were cited thousands and thousands of times.  That's why they wanted him to join.

It makes no sense.

And they point to two licenses, Seiko Epson and LS Cable.  We don't know the circumstances.  They look like they were fire sales selling hundreds of patents for just a few million dollars.  And then we heard the proxy portfolio that had a very small market share, they had good patents, they sold the company for a hundred million dollars.  The fact that Samsung was able to buy a bunch of reject patents that they couldn't even show they used a single one for cheap, that doesn't give them the ability to nickel-and-dime Mojo Mobility.

There was a specific survey conducted by Doctor Reed-Arthurs that showed that Samsung gets about $50-a-unit benefit --

THE COURT:  One minute remaining.

MR. POLLINGER:  -- in these phones.  $50 a unit.  But we're only asking for $2 a unit.  This is a premium phone.  This is the premium phone from Samsung that Samsung competes against Apple premium phones.  They get $50 a benefit as the only survey showed.  That was the only survey.  They hired a survey expert, but they didn't want her to do a survey.

Instead, they want to point to the Seiko Epson and LS Cable fire sale patent licenses they got so they can try to nickel-and-dime Doctor Partovi.

This is why our Constitution recognizes patents. It's been a pleasure and an honor to represent Mojo Mobility in this case. And for one last final time, I thank you, I thank you for your service, I thank you for your attention, I thank you.

THE COURT: All right. Ladies and gentlemen, I have a few final instructions for you.

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. All parties expect that you will carefully and impartially consider all the evidence, follow the law as I have given it to you, and reach a just verdict, regardless of the consequences.

Answer each question in the verdict form based on the facts as you find them to be. Again, do not decide who you think should win this case and then answer the questions to reach that result. And once more, I remind you, your answers to the questions in the verdict and your verdict in this case must be unanimous.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal

worth, and holding the same or similar stations in life. A patent owner is entitled to protect its rights under the laws of the United States, and this includes bringing a suit in a United States District Court for money damages based on allegations of infringement. The same guarantees allow alleged infringers to vigorously defend against assertions of infringement and allow an accused party to assert that patent claims are not valid, that they are invalid.

The law recognizes no distinction between types of parties. All corporations, partnerships, other business organizations, and individuals stand equal before the law, regardless of their size, regardless of who owns them, and they are to be treated as equals.

Now, when you retire to the jury room in just a few minutes to deliberate on your verdict, as I've told you, you'll each have your own printed copy of the Court's final instructions to you.

If during your deliberations you desire to review any of the exhibits that have been admitted and used during the course of the trial, then you should advise me by a written note signed by your foreperson and delivered to the Court Security Officer identifying which exhibit or exhibits you want, and in that case I will send that exhibit or those exhibits to you.

When you retire, you should first select your foreperson

1338

and then conduct your deliberations.  If you recess during your deliberations for any reason, follow all the instructions the Court has given you about your conduct during the trial.

And after you have reach a unanimous verdict in this case, your foreperson is to fill in the answers in the verdict form reflecting your unanimous decisions, sign that verdict form as foreperson, date it, and advise the Court Security Officer that the jury has reached a verdict.

Do not reveal your answers until such time as you are discharged, unless otherwise directed by me.  And you must never disclose to anyone, not even to me, your numerical division on any unanswered question.

Any notes that you've taken over the course of this trial are aids to your memory only.  If your memory should differ from your notes, then rely on your memory and not your notes.  A juror who has not taken notes should not be unduly influenced by the notes of other jurors and should rely on his or her own recollection of the evidence.  Notes are not entitled to any greater weight than the recollection or impression of the juror about the testimony.

If you want to communicate with me at any time during your deliberations, you should give a written question or message to the Court Security Officer.  That message should be signed by your foreperson and dated with the appropriate date.  The Court Security Officer will bring the message to me, and

1339

then I will respond to you as promptly as possible, either in writing or by having you brought back into the courtroom where I can address you orally.  And I will always first disclose to the attorneys in the case any question that you have sent to me and my response before I respond to your questions.

Now, after you've reached a verdict, ladies and gentlemen, and after I have accepted that verdict and discharged you from your position as jurors, you need to understand that at that point you will be completely free to discuss with anyone that you'd like to your experience as a juror in this case.  At the same time, you will be completely free not to discuss your experience as a juror, if that is your decision.  That will be your decision at that time 100 percent.  It will be up to you and nobody else.

I'm now going to hand eight copies of the Court's final instructions to the jury together with a clean single copy of the verdict form to be delivered to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room to deliberate on your verdict.  We await your result.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, you are welcome to wait here in the courtroom.  If you choose to wait off premises, then keep the cell phone of the contact person with each trial team on and open in case we need to get you back here for either a

question or a return of the verdict.

Awaiting either a question from the jury or the return of their verdict, we stand in recess.

(Jury deliberates.)

THE COURT:  Be seated, please.

Counsel, I've received the following note from the jury: "Can we please have JX 135?"  And the note is signed by Juror No. 1, Ms. Cox as the foreperson, and it is dated with today's date.

I'll hand the original note to the Courtroom Deputy.

And counsel, I've prepared the following written response to send in with JX 135 itself, which says, "In response to jury note No. 1, I am sending you the following:  Exhibit JX 135."

Any objections from either party for me to respond in that way and send the jury the requested exhibit with this cover sheet?

MR. POLLINGER:  No, Your Honor.

MR. UNIKEL:  No objection, Your Honor.

THE COURT:  All right.  Do we have JX 135 at hand, Ms. Brunson?

THE CLERK:  I can get it.

THE COURT:  Okay.  If you'll hand it to me I'll put this cover sheet with it and hand it to the Court Security Officer.

And counsel, if you'll approach, I have a copy of my written response for each of you.

MR. UNIKEL:  Thank you, Your Honor.

THE COURT:  Mr. Richardson, if you would hand this to the jury, please.

And Ms. Brunson, here's a duplicate of my response for the Court's file.

Awaiting either another note from the jury or a return of their verdict, we stand in recess.

(Jury left for the day at 5:30 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts                09/12/2024

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER